**Fabio ARMILIATO, Petitioner,**

v.

**Irena ZARIC–ARMILIATO, Respondent.**

**No. 01 Civ. 0136(WHP).**

United States District Court, S.D. New York.

May 3, 2001.

*DECISION AND ORDER*

PAULEY, District Judge.

Petitioner Fabio Armiliato filed this petition pursuant to the Hague Convention on the Civil Aspects of Child Abduction (the "Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.,* seeking an order requiring his wife Irena Zaric–Armiliato to return their child Alessandra to Italy. On February 14, 2001, this Court commenced a plenary hearing to determine whether Ms. Zaric–Armiliato wrongfully removed Alessandra from Italy.[1]

For the following reasons, this Court grants the petition.

*FINDINGS OF FACT*

Mr. Armiliato is a world-renowned opera tenor and an Italian citizen. He was born in Genoa, Italy and most of his family still resides there. Since 1996 Mr. Armiliato has maintained a residence for tax purposes in Monaco. (Tr. 241.) In 1992, he met Irena Zaric–Armiliato, who is also an opera singer, while they were performing "Carmen" in Spain. (Hearing Transcript ["Tr."] 444.) They were married a year and one-half later in Genoa, Italy. (Tr. 101.)

Ms. Zaric–Armiliato is a citizen of the former Yugoslavia/Serbia and her family resides in Belgrade, Serbia. She maintains an apartment in Belgrade. In 1995, Ms. Zaric–Armiliato also obtained Italian citizenship. (Tr. 103.) Her Italian passport issued in 1995 identifies Genoa, Italy as her residence and domicile. (Tr. 513.) In 1999, Ms. Zaric–Armiliato obtained a Serbian passport listing her Belgrade

Robert S. Zeif, Parmet & Zeif, P.C., New York, NY, for Petitioner.

Guillermo A. Gleizer, New York, NY, for Respondent.

---

1. Because the petitioner has a demanding professional schedule and was unable to proceed on an expedited basis, the parties expressly waived their rights to request a decision on the petition within six weeks. *See* the Convention, art. 11.

apartment as her residence and domicile. (Tr. 511, 516.) Ms. Zaric–Armiliato does not have any official document identifying New York as her place of domicile, nor does she have a United States social security number. (Tr. 521–23.)

Alessandra, the couple's only daughter, was born in Genoa, Italy on March 25, 1994. She is a citizen of Italy and her primary language is Italian. (Tr. 103, 105.) Like her mother, Alessandra has both Italian and Serbian passports. Her Italian passport identifies her domicile as Genoa, Italy and her Serbian passport, which was obtained on February 17, 2000, identifies her domicile as Belgrade, Serbia. (Tr. 517.)

None of the parties or any member of their families is an American citizen or domiciled in the United States.

Mr. Armiliato was the primary financial provider for the family while Ms. Zaric–Armiliato was the primary child-care provider. Although Mr. Armiliato's professional commitments were demanding, he cared for his daughter Alessandra when his schedule permitted by, among other things, taking her to doctors' appointments, restaurants, parks and musical performances. (Tr. 203–04.)

Mr. Armiliato's operatic obligations require him to travel frequently all over the world. Since Alessandra's birth, Mr. Armiliato has rarely stayed for more than one month in any location. Until Alessandra turned six and was required by Italian law to attend school, she and Ms. Zaric–Armiliato often traveled with Mr. Armiliato when he had engagements of more than a week. Their travels reached a crescendo in 1999.

From March 4th through April 6th of that year, Mr. Armiliato shuttled between Hamburg, Germany and Genoa, Italy while Ms. Zaric–Armiliato and Alessandra stayed in Genoa. On April 7th, the family traveled to Baltimore, Maryland where Mr. Armiliato had an extended engagement. On May 4th, the family went to New York City where they stayed for five days. On May 10th, Mr. Armiliato traveled to Montreal, Canada. Ms. Zaric–Armiliato and Alessandra joined him in Montreal on May 26th where they remained until June 13th. Then, they flew to Genoa, Italy where Mr. Armiliato rested for five days before he traveled to Vienna, Austria for a week. Ms. Zaric–Armiliato and Alessandra remained in Genoa where Mr. Armiliato rejoined them on June 28th. Three days later, the family went to Verona, Italy where Mr. Armiliato performed "Aida" for three weeks. They returned to Genoa for three days at the end of July before traveling together to Buenos Aires, Argentina where they remained until August 14th. On August 15th, the family returned to Genoa for three days. Then, Mr. Armiliato and Alessandra went to Verona, Italy for several days while Ms. Zaric–Armiliato traveled to Belgrade, Serbia. The family was reunited in Genoa on August 27th. (Pet.'s Ex. 9.) Alessandra's repeated return to Genoa, Italy is the recurring theme throughout her peripatetic adventures. (Pet.'s Exs. 9 & 10.) Even in her earlier years when Alessandra traveled less frequently, she spent more time in Genoa than any where else. (Pet.'s Exs. 9 & 10.)

When the family traveled, both parents tried to maintain continuity in Alessandra's life. For example, they arranged for her to receive medical care in each country, and paid for her to attend classes at an Italian–American school when she was in New York, which her parents paid for by the week.

In Genoa, Italy, Alessandra lived with her parents in their rental apartment[2] (Tr.

2. The lease states that the apartment is a second home for temporary stays and tour-

257–61) near Mr. Armiliato's brothers and sisters. There, until she turned six, she attended pre-school and spent time with her paternal grandparents, aunts, uncles and cousins. (*See, e.g.,* Pet.'s Ex. 5: Alessandra's passport; Pet.'s Exs. 9 & 10: Armiliato family itinerary.)

In 1994 and 1995, Mr. Armiliato performed several times in New York, Philadelphia, Palm Beach and San Francisco. (Pet. Ex. 10: Armiliato itinerary; Tr. 214.) Those performances left him with a financial windfall which he invested in an apartment in New York City. (Tr. 214.) Ms. Zaric–Armiliato loaned her husband some of the down payment, but the apartment is only in Mr. Armiliato's name. (Tr. 216.)

The family stayed in Mr. Armiliato's New York apartment whenever he performed in New York City. (Tr. 217.) He also periodically rented the apartment to friends. Although he stated on his mortgage loan that he would use the property as his principal residence for at least one year, he did not. (Tr. 273.) Rather, he declared himself a non-resident on his United States tax returns and the apartment in Genoa as his permanent residence. (Tr. 230, 233.)

In 1997, the Armiliatos experienced marital difficulties. However, after seeing a marriage counselor they eventually reconciled. (Tr. 110–13.)

Also that year, Mr. Armiliato's career blossomed in the United States. He was engaged frequently by the Metropolitan Opera in New York City and the San Francisco Opera. The opportunity to work more regularly with the Metropolitan

Opera developed at that time. (Tr. 239.) Before he could perform in the United States Mr. Armiliato had to obtain a work visa for each engagement, a cumbersome task that was often not completed until the day of the performance. (Tr. 237.) On the advice of his manager, Mr. Armiliato decided to apply for a green card for persons with "special talents." The green card would permit him to live abroad but perform in the United States without having to apply repeatedly for work visas. Mr. Armiliato also believed it would decrease his tax liability. However, Mr. Armiliato never intended to make the United States his permanent residence. (Tr. 246.) Ms. Zaric–Armiliato did not apply for a green card independently.[3] She understood that if Mr. Armiliato obtained the green card he could request that similar privileges be extended to his family.

In late 1999, irreconcilable differences again fractured the Armiliatos' marital relationship.

The following year, Mr. Armiliato indefinitely postponed the requisite interview with the American government concerning his application for a green card. The effect was to suspend the processing of his application. (Tr. 245–46.) By that time, the negotiations with the Metropolitan Opera had collapsed and Mr. Armiliato's professional focus shifted to Europe. (Tr. 245.)

In the spring of 2000, Ms. Zaric–Armiliato left Genoa with Alessandra for New York where they spent most of April and all of May. (*E.g.,* Pet. Ex. 9: Armiliato itinerary.) Alessandra attended the Ital-

---

ism. (Resp.'s Ex. SA: Lease Agmt.) However, Mr. Armiliato credibly testified that the owner declared the apartment a secondary residence because if the apartment was declared a primary residence the owner would be subject to rent control as well as more stringent taxes. (Tr. 257–61.)

3. At a conference held on March 7, 2001, Ms. Zaric–Armiliato's attorney informed the Court that Ms. Zaric–Armiliato is applying for a green card.

ian–American school during May and visited with friends in New York. Alessandra and her mother returned to Genoa on June 2, 2000, where they resided until mid-December.

In late August 2000, petitioner and respondent separated. (Tr. 360.) Mr. Armiliato ultimately moved into his parent's apartment while Ms. Zaric–Armiliato resided in the parties' Genoa apartment with Alessandra.

In September 2000, Mr. Armiliato vacationed with Alessandra for one week. (Tr. 228–29.) When they returned to Genoa, Alessandra, then six, started kindergarten at a private Italian–American school where she was enrolled for the 2000–01 school year. She continued to attend that school in Genoa until December 12, 2000. Alessandra was also enrolled in an Italian–American school in New York so that when the family traveled to New York, where Mr. Armiliato was scheduled to perform that fall, she could continue her studies.

In October 2000, Mr. Armiliato filed an action in Genoa for a judicial separation under Italian law. He requested joint custody of Alessandra and an order directing Ms. Zaric–Armiliato, who had transferred approximately $20,000 from Mr. Armiliato's account, not to remove their daughter from the country. (Pet.'s Ex. 1: Complaint for judicial separation; Tr. 528.) The Italian court scheduled a hearing for January 17, 2001.

On December 8, 2000, pursuant to an agreement between the parties, Mr. Armiliato gave Ms. Zaric–Armiliato $1,000 and spent the weekend with Alessandra at his parent's house in Genoa. On December 10, 2000, he returned Alessandra to Ms.

Zaric–Armiliato in Genoa. The next day, Ms. Zaric–Armiliato took Alessandra to school and requested copies of future homework assignments. (Tr. 544.) Ms. Zaric–Armiliato advised the school that she was taking Alessandra to New York, but asked the school authorities not to disclose that to Alessandra because the trip was a surprise. (Tr. 544.)

On December 12, 2001, Ms. Zaric–Armiliato took Alessandra to New York without informing Mr. Armiliato. They entered the United States under a visa waiver program which permitted them to remain only until March 11, 2001. On December 13, 2001, Mr. Armiliato's attorney in Genoa received a letter from Ms. Zaric–Armiliato's attorney advising that Ms. Zaric–Armiliato had gone to New York with Alessandra. Not surprisingly, Ms. Zaric–Armiliato's attorney also canceled a settlement conference scheduled for December 14, 2000 in Genoa concerning the Italian matrimonial proceeding. (Tr. 368.) Ms. Zaric–Armiliato's attorney promised that Ms. Zaric–Armiliato and Alessandra would return to Genoa by Christmas Day.

On December 19, 2000, Ms. Zaric–Armiliato filed for divorce and custody in New York State Supreme Court because she believed that New York divorce law would be more favorable to her. (Tr. 539.) She and Alessandra have remained in New York since that time.[4] Ms. Zaric–Armiliato cannot work in the United States under the visa waiver program. (Tr. 508–11.)

On December 28, 2000, Mr. Armiliato instituted criminal proceedings in Italy against Ms. Zaric–Armiliato for the abduction of their child and her unilateral withdrawal of funds from his account. An arrest warrant was issued in Italy. (Pet.'s Exs. 20 & 21.) However, to facilitate Ms.

---

**4.** Ms. Zaric–Armiliato and her attorney agreed to surrender Alessandra's Italian and Serbian passports to the Court during the pendency of this proceeding. On February 12, 2001, Alessandra's passports were filed under seal.

Zaric–Armiliato's appearance at the January 17, 2001 judicial separation hearing in Italy, Mr. Armiliato procured a letter from the Genoa prosecutor agreeing not to arrest her if she returned to Italy for that hearing. In the interim, Mr. Armiliato filed the petition in this Court.

Ms. Zaric–Armiliato did not appear in person at the Italian hearing. However, her attorney was present. The Italian court granted Mr. Armiliato temporary custody of Alessandra and adjourned the matter to April 12, 2001. (Pet.'s Ex. 2: Court of Genoa Minutes of Personal Separation.)

Thereafter, Mr. Armiliato obtained an advisory opinion from the Juvenile Court of Genoa pursuant to Article 15 of the Convention declaring that Alessandra's "customary residence" was Genoa, Italy. It also determined that Ms. Zaric–Armiliato's removal of Alessandra to New York without Mr. Armiliato's consent was illegitimate under Article 316 of the Italian Civil Code, "which provides that parental authority on children shall be exercised by both parents by joint agreement." (Ex. 3: Declaration of the Juvenile Court of Genoa.)

On March 21, 2001, the New York State Supreme Court, New York County issued a Decision and Order denying petitioner's motion to dismiss the New York divorce action without prejudice. (Decision and Order, Index No. 3505858/00.)

### CONCLUSIONS OF LAW

I. *The Convention*

The objectives of the Convention are: "(a) to secure the prompt return of children wrongfully removed to or retained in any contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." The Convention, art. I (1980). The Convention is intended to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Perez–Vera, Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session ¶ 11 (1980), *available at http:// www.hcch.net/e/conventions/expl 28e.html.*

To effect the goals of the Convention, signatory states have agreed that when a child who is habitually residing in one signatory state is wrongfully removed to, or retained in, another, the latter state "shall order the return of the child forthwith." The Convention, art. 12. The Convention also provides that "until it has been determined that the child is not to be returned," the judicial or administrative authorities of a signatory state "shall not decide on the merits of rights of custody." The Convention, art. 16. Both the United States and Italy are signatories to the Convention.

The obligations of a signatory state are only triggered if a child has been "wrongfully removed or retained." A removal or retention is wrongful if:

(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The Convention, art. 3. It is the petitioner's burden to prove that the child was wrongfully removed by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A);

*Croll v. Croll,* 229 F.3d 133, 138 (2d Cir. 2000).

"If a petitioner shows [the child] was wrongfully removed, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of the four narrow exceptions apply." *Croll,* 229 F.3d at 138 (citing 42 U.S.C. § 11601(a)(4)); *Blondin v. Dubois,* 189 F.3d 240, 245 (2d Cir.1999). Two of those exceptions may be established only by "clear and convincing evidence" either that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," pursuant to Article 13(b) of the Convention, or that return of the child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms," pursuant to Article 20. *Blondin,* 189 F.3d at 245; 42 U.S.C. § 11603(e)(2)(A) (setting forth standard of proof for defenses pursuant to Articles 13(b) and 20). The other two exceptions to the presumption of repatriation need only be established by a preponderance of the evidence either that judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment, pursuant to Article 12 of the Convention, or that the petitioner was not actually exercising custody rights at the ·time of the removal, pursuant to Article 13(a) of the Convention. *Blondin,* 189 F.3d at 246; 42 U.S.C. § 11603(e)(2)(B) (setting forth standard of proof for defenses pursuant to Articles 12 and 13(a)).[5]

In order to determine whether Alessandra was wrongfully removed, this Court must resolve four issues: (1) When did the removal or retention at issue take place; (2) Immediately prior to the removal or retention, in which state was Alessandra habitually resident; (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual resident; and (4) Was the petitioner exercising those rights at the time of the removal or retention, or would he have been exercising those rights but for the removal or retention? *See, e.g., Diorinou v. Mezitis,* 237 F.3d 133, 141 (2d Cir.2001); *Mozes v. Mozes,* 239 F.3d 1067, 1070 (9th Cir.2001). Each question will be addressed seriatim.

The answer to the first question is uncontroverted: Ms. Zaric–Armiliato removed Alessandra from Italy and brought her to New York without the petitioner's knowledge or permission on December 12, 2001. The answer to the second question is the lynchpin of this case. The answers to questions three and four in turn depend on where Alessandra habitually resided prior to the removal.

## II. *Habitual Residence*

Petitioner claims that prior to removal, Alessandra's habitual residence was Italy. Respondent argues that it was New York.

▆ The Convention does not define "habitual residence." "[W]ish[ing] to avoid linking the determination of which country should exercise jurisdiction over a custody dispute to the idiosyncratic legal definition of domicile and nationality of the forum where the child happens to have been removed," *Mozes,* 239 F.3d at 1071, the Con-

---

5. In addition to the four exceptions, the Convention allows a court to take into account the preference of an older child. The court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." The Convention, art. 13; *Blondin,* 189 F.3d at 246 n. 3. Since Alessandra was six-years-old when this proceeding was filed, this Court did not inquire concerning her preference.

vention instructs courts to interpret the expression according to "the ordinary and natural meaning of the two words it contains," *In Re J. (A Minor)* [1990] 2 A.C. 562, 578 (U.K. House of Lords) (Lord Brandon). "[T]he question whether a person is or is not habitually resident in a specified country is a question of fact to be decided by reference to all the circumstances of any particular case." *Id.*

The Second Circuit has not had occasion to define "habitual residence." However, as Judge Kozinski has observed, "the most straightforward way to determine someone's habitual residence would be to observe his behavior." *Mozes*, 239 F.3d at 1073. Such a determination would be based strictly on objective criteria such as how long the child resided in a state and whether her life was centered around a particular location. However, merely evaluating objective criteria could skew the results depending on what period of time one studied. *Id.* For instance, the outcome could be different if one scrutinized the residence of a child for one summer, one year, or her entire life.

To avoid such pitfalls, the English courts require a "degree of settled purpose" in order to establish habitual residence:

> The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. This not to say that the "propositus" intends to stay where his is indefinitely; indeed his purpose, while settled, may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regu-

lar abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Shah v. Barnet London Borough Council and other appeals*, [1983] 2 A.C. 309, 344 (U.K. House of Lords).[6] At least one court of appeals has adopted the "settled purpose" test. *See Feder v. Evans–Feder*, 63 F.3d 217, 223 (3d Cir.1995).

The "settled purpose" principal is difficult to apply to young children who generally are unable to articulate reasons such as business opportunities to habitually reside in a particular place. Moreover, as Judge Kozinski noted, a child may have a "settled purpose" to reside at summer camp for a limited period, yet summer camp, with a predetermined beginning, middle and end, is not the child's habitual residence. *See Mozes*, 239 F.3d at 1074.

Although the "settled purpose" of a small child like Alessandra is elusive, the principle is informed by the subjective intent of those entitled to fix the child's residence. *See Mozes*, 239 F.3d at 1076; *Feder*, 63 F.3d at 224 ("a determination of [habitual residence] must ... consist[ ] of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there"). Determining intent when the parents disagree about their child's habitual residence is an Augean chore. In such circumstances, it is necessary to look beyond the subjective intent of the parents to the objective manifestations of that intent.

One of the objective manifestations of intent is the relative period of time the

---

6. While other courts have cited *In Re Bates*, No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, "slip op." (U.K.1989) in further support of this proposition, this Court has been unable, despite diligent efforts, to locate such an opinion. These efforts have included inquiries to the courts that cited the case, the United Kingdom's Supreme Court of Judicature and Oxford University.

parties resided in the alleged habitual residence. As Lord Brandon observed,

> [T]here is a significant difference between a person ceasing to be habitually resident in country A, and his subsequently becoming habitually resident in country B. A person may cease to be habitually resident in country A in a single day if he or she leaves it with a settled intention not to return to it but to take up long-term residence in country B instead. Such a person cannot, however, become habitually resident in country B in a single day. An appreciable period of time and a settled intention will be necessary to enable him or her to become so.

*In Re J.*, 2 A.C. at 578–79; *see also, Mozes*, 239 F.3d at 1078 ("[H]ome isn't built in a day. It requires the passage of '[a]n appreciable period of time.'") (quotations omitted); *Feder*, 63 F.3d at 224 ("a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization"); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401–02 (6th Cir.1993) ("[a child's] habitual residence can be 'altered' only by a change in geography and the passage of time").

Whether the parties resided in the residence on a temporary or conditional basis is also significant. Take Judge Kozinski's summer camp example; one of the reasons that summer camp cannot be a habitual residence is that it is temporary and finite. So too, if the parties stayed at a particular location for the purpose of vacationing or for a limited employment stint, the notion of habitual residence is undermined. *See, e.g., Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1285 (S.D.Fla.1999) (Florida is not the child's habitual residence because, *inter alia*, "the parents' settled purpose of their family trip to Florida was, as planned, a family vacation finite in its duration ... [and] the parties had packed for only a temporary visit, rather than a permanent move"), *appeal dismissed*, No. 00–10295, 244 F.3d 1250 (11th Cir.2001); *In re Morris*, 55 F.Supp.2d 1156, 1161 (D.Colo.1999) (father's finite sabbatical to Switzerland where he held a teaching assignment for only one semester indicated that Switzerland was not the family's habitual residence).

The steps the parents have taken to acclimate their child to her surroundings is another objective manifestation of intent to habitually reside in a locale. *See, e.g., Mozes*, 239 F.3d at 1078. Those steps may include an attempt to establish a regimen, school attendance, and the presence of family, friends and doctors.

■ Alessandra was born in Italy and her primary language is Italian. Her father's entire family lives in Italy, and she and her parents are all Italian citizens. While Alessandra has traveled around the world and remained abroad for up to two months at a time, she continually returned to Genoa, Italy. Moreover, the purpose of Alessandra's travel generally was to accompany her father when he performed. Mr. Armiliato's operatic engagements were temporary and finite.

Immediately prior to Ms. Zaric–Armiliato's removal of Alessandra from Genoa, Alessandra spent seven months in Genoa, except for a brief vacation with her father. She regularly attended school in Genoa for the first half of the school year and visited with her grandparents in Genoa most weekends. That her parents registered her in an Italian–American school in New York City to save a place for her when the family was in New York is not persuasive. Mr. Armiliato was likely to perform in New York and her parents did not want Alessandra to miss school.

The circumstances surrounding Ms. Zaric–Armiliato's removal of Alessandra are also significant. There is no evidence that Ms. Zaric–Armiliato ever discussed with her husband or daughter a plan to move to New York. Rather, she removed Alessandra from Genoa without notice. Even Ms. Zaric–Armiliato's attorney's letter notifying Mr. Armiliato that Alessandra was in New York asserts that the visit was temporary.

Moreover, Ms. Zaric–Armiliato and Alessandra cannot remain in the United States indefinitely. They arrived in New York on the visa waiver program, which only permitted them to remain here until March 11, 2001. Ms. Zaric–Armiliato cannot work in the United States because she has neither a work permit nor any job prospects here. *See Mozes*, 239 F.3d at 1082 (mother and children traveling to United States on temporary visa and that family's economic base remaining in Israel indicates that parents had not agreed to stay indefinitely in United States). The only significant ties the family has to New York are that Mr. Armiliato owns an apartment in Manhattan and that Alessandra has made some friends and occasionally attended a pre-school here. Those facts do not outweigh the indicia pointing to Genoa as her habitual residence.

Respondent points to petitioner's application for a green card as evidence that the parties intended to settle permanently in New York. However, the stated purpose of the green card was to facilitate Mr. Armiliato's ability to perform in the United States and to confer upon him a tax benefit. Further, Mr. Armiliato stopped pursuing the green card application in 1999, and by 2000 it was clear that if he had ever considered relocating to New York, he had abandoned that idea as the marital relationship deteriorated. Ms. Zaric–Armiliato's personal desire to establish a permanent home in New York as her marriage unraveled is not sufficient to establish Alessandra's habitual residence here.

For all of the above reasons, it is apparent that immediately prior to Ms. Zaric–Armiliato's removal of Alessandra to New York, Genoa was Alessandra's habitual residence.

## III. *Custody Rights*

■ The analysis does not end with the determination of Alessandra's habitual residence. This Court must also determine questions three and four—whether Ms. Zaric–Armiliato's removal of Alessandra breached rights of custody enjoyed by Mr. Armiliato under Italian law and whether Mr. Armiliato was exercising those rights at the time of the removal.

Article 14 of the Convention provides that this Court may take judicial notice of the law of the habitual residence in order to determine whether the removal breached Mr. Armiliato's rights of custody.[7] The Convention, art. 14; *see also Mozes*, 239 F.3d at 1084.

The Convention states that "rights of custody" includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." The Convention, art. 5(a). Rights of custody may

---

**7.** Article 14 of the Convention states:
In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." The Convention, art. 3. There were no court orders or agreements between the parties with respect to the custody of Alessandra when she was removed from Italy. Accordingly, Italian law determines Mr. Armiliato's rights of custody.

The applicable Italian law states that, "[a] child is subject to the authority of its parents until majority ... or emancipation. The authority is exercised by both parents by mutual agreement." Code Civil art. 316(It.) It further states that "[t]he spouses agree between them the pattern of family life and fix the residence of the family according to the requirements of both and to those prevailing for the family. Each of the spouses has the authority to implement the agreed pattern." Code Civil art. 144(It.) Thus, Mr. Armiliato, who was married when Ms. Zaric–Armiliato removed Alessandra from Italy, enjoyed rights of custody as that term is defined by the Convention. By unilaterally removing Alessandra from Italy and determining the child's residence without Mr. Armiliato's consent, Ms. Zaric–Armiliato breached her husband's rights of custody.

■ Ms. Zaric–Armiliato claims that Mr. Armiliato was not exercising his custody rights at the time of the removal because she was Alessandra's primary caretaker. Although Alessandra resided primarily with her mother, the evidence presented at the hearing demonstrates that prior to the separation Mr. Armiliato pro-vided the sole means of financial support for Alessandra. After the separation, he was in constant contact with Alessandra and visited her regularly. He assisted in determining where she should attend school, ministered to her medical needs and took her on vacation. Additionally, immediately prior to the removal, Mr. Armiliato spent the weekend caring for Alessandra at his parents home. Accordingly, Mr. Armiliato was exercising his rights of custody at the time of the removal. *See, e.g., Whallon v. Lynn,* 230 F.3d 450, 453, 459 (1st Cir.2000) (rights of custody exercised where respondent spent two weekends a month with child, lived near her, provided some financial support, drove her to school, bought her clothes, took her to the doctor, helped her with homework); *Norden–Powers v. Beveridge,* 125 F.Supp.2d 634, 640 (E.D.N.Y.2000) (rights of custody exercised where parties participated in decision making regarding education and social welfare of children, looked after their medical needs and participated in their personal care); *cf. Croll,* 229 F.3d at 138–39 ("custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc.").[8]

Accordingly, Ms. Zaric–Armiliato's removal of Alessandra from Genoa breached Mr. Armiliato's rights of custody which he was exercising at the time of the removal. Since Ms. Zaric–Armiliato has not presented any evidence that any of the four narrow exceptions set forth in the Convention apply in this case, it is incumbent upon this Court to order that Alessandra be returned to Italy.

---

**8.** Neither party has argued that this Court must give deference to the Italian juvenile court's findings. Moreover, this Court need not determine what weight to accord the Italian juvenile court's determination that Alessandra was a habitual resident of Italy and that Ms. Zaric–Armiliato's removal of Alessandra violated Mr. Armiliato's rights in custody because it is clear from the evidence presented to this Court that the removal was wrongful.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that Alessandra Armiliato be returned to Italy forthwith in the custody of petitioner Fabio Armiliato. Alessandra Armiliato's Italian and Serbian passports will be released to petitioner or his attorney Robert Zeif, Esq. The Clerk of the Court is directed to enter judgment in favor of the petitioner Fabio Armiliato and close this proceeding.