Orlando Arturo **DIAZ ARBOLEDA,** Petitioner,

v.

Clara Inez Gil **ARENAS,** Respondent.

No. 03–CV–6305 (NGG).

United States District Court, E.D. New York.

March 31, 2004.

John J. Garzon, Sunnyside, NY, for Plaintiff.

Ephraim Savitt, New York City, for respondent.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

GARAUFIS, District Judge.

On December 16, 2003 Orlando Arturo Diaz Arboleda ("Diaz") filed a petition in this court pursuant to The Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* Diaz seeks an order requiring that his three minor children Valentina Diaz, Luis Eduardo Diaz, and Juan Jose Diaz be returned with Diaz to Colombia for ultimate determination of the custody dispute between Diaz and the mother of the children, respondent Clara Inez Gil Arenas ("Gil"). The children currently reside with their mother in Fresh Meadows, Queens. The court has appointed a guardian *ad litem,* attorney Elizabeth Hellman, to represent the interests of the children. For the reasons explained below Diaz' petition is DENIED, and no order requiring the children to return to Colombia will issue.

## Findings of Fact

On March 2, March 4, and March 9 of this year the court held a hearing on the instant petition where the court heard testimony from four witnesses, including Diaz and Gil, and received evidentiary submissions from the parties, including a report from Ms. Hellman. On March 9, the court also interviewed the two older children, Valentina and Luis, *in camera.* Based upon this evidence, the court reaches the following findings of fact described below:

After knowing each other in their hometown of Medellin, Colombia since the early 1980's, Diaz and Gil were married there on January 28, 1989. Through the end of the 1990's the couple lived in various parts of Medellin with their children, who were born in 1989, 1991, and 1994. The children attended school in Medellin, spent time with their extended family in Colombia, and led normal lives in that country.

In about May of 2000, the family came to the United States (specifically New York City) for the first time. Notwithstanding the fact that the family traveled on a tourist visa, I find that the purpose of this trip, a purpose shared by both Diaz and Gil, was to settle in the New York area and make a new life in the United States with a new home, jobs, and schools. While Diaz testified that the purpose of the trip was not to settle in New York but rather to take a vacation, I find that his testimony on this question is not credible for the following reasons: (1) Diaz himself testified that before coming the United States he sold his family's sole means of support—a bus that he hired out to groups, with himself as a driver. Such an action is inconsistent with a plan merely to take a vacation; (2) Diaz himself also testified that before leaving for the United States in May of 2000 he rented out the home where his family had been living, and the length of the lease was at least a

year. This action is also obviously inconsistent with the intent to travel to the United States for a vacation; (3) Diaz himself testified that soon after arriving in the United States he secured a job in building maintenance, behavior inconsistent with coming to the United States for a vacation; (4) the Diaz children were taken out of their school in Colombia two weeks before the school term there ended so the children could join their parents for the trip to the United States, and when they returned to Colombia much later the school vacation period had long ago ended; (5) Diaz' testimony that his family did not intend to settle permanently in the United States was contradicted by the sworn testimony of Gil, Christian Meneses (Gil's nephew), and Gloria Patricia Monsalve (a relative of Diaz by marriage) at the hearing, and by the accounts of his children. The children's statements on this issue are summarized in the report prepared by Ms. Hellman and were repeated to me *in camera* by Luis Eduardo Diaz. The children indicated that before the family left Colombia in August of 2000, their father told them to say good-bye to their relatives and that they were moving to the United States for good; and (6) the believability of all of Diaz' testimony is clouded by the sometimes bizarre and generally unsupported accusations he has made against his wife and other people, including accusations that: someone (possibly his wife) had hired a hit man to kill him (an accusation he repeated to his children); that his wife's friends/landlords had plans to operate a website involving child pornography (a scheme in which he said his wife may have been involved); and that those same friends/landlords used or trafficked in narcotics (also a scheme in which he said his wife may have been involved). Some of these unsupported allegations were repeated in divorce papers Diaz filed in Colombia.

The family resided in the New York area for a few months, until about the end of August, 2000. At that time Diaz and the children returned to the Medellin area, with Gil's permission, while Gil remained in New York. It is undisputed that the reason Diaz returned to Colombia was that he needed facial/dental surgery, and Diaz could obtain such surgery only in Colombia, rather than the United States. I further find that the reason Diaz and Gil decided the children should go to Colombia with Diaz is because the family had been unable to obtain an apartment in New York City in which they could all live. The couple decided that Gil would remain in New York City so that she could work, send money back to Colombia to support the family while Diaz was recovering from his surgeries, and look for an apartment where the family could live together once Diaz healed and he and the children returned to New York. Diaz' medical situation turned out to be more complicated than he originally believed, and he ended up needing five surgeries over the course of about a year before he was ready to return to New York. Diaz and Gil originally had expected that Diaz and the children would return to New York sooner. While Diaz was undergoing his surgeries and recuperating from them, the children often were in the care of Diaz' sister, Delia. During this yearlong period Gil sent money to her family in Colombia and maintained regular contact with the children by phone.

In about August of 2001, Diaz and the children returned to New York. Diaz asserts that he made this trip only because his children missed their mother, that he planned for the family to stay only for a month in the United States, and that Gil had promised to return to Colombia with him after he brought the children there. I do not find this assertion credible, either, and based upon all of the testimony at the

hearing (including the fact that Diaz began working in building maintenance and construction again soon after returning to New York) I find that Diaz returned to New York in August of 2001 with the intent that his family would settle there, as he and Gil had originally intended when they first came to the United States in August of 2000.

By September of 2001, the whole family was living in Deer Park, Long Island, and the children attended school there. Both parents were working outside the home. Within a short time after the family moved to Deer Park, Diaz and Gil became estranged, and Diaz moved out of the marital residence. Diaz continued, however, to communicate with Gil and to take the children out on the weekends. Diaz also made financial contributions toward the children's support. On December 29, 2001, Diaz picked up all of the children under the pretense that he was going to have a normal visit with them, as he had done before.

Instead, with virtually no advance notice to the children themselves, in the early morning hours of December 30, 2001 Diaz told Gil on the phone that he was returning to Colombia with the children, after Valentina managed to call her mother from a pay phone. Diaz then took the children to JFK Airport and attempted to fly with them back to Colombia. The children were very upset and did not want to go back to Colombia or leave their mother. They were able to notify an airline employee that they did not wish to go back to Colombia and that their mother had not given permission for them to leave. The airline employee called the police, and the police returned the children to Gil.

Less than a month later, on about January 17, 2002, Diaz returned to Colombia. Diaz did not did return to the United States or see the children again until the proceedings in this case began, though he

did have some telephone contact with them. Diaz did not send any more money to support the children after he left the United States, though he claims this was on the advice of Colombian authorities who told him that making such payments would constitute acquiescence in the children remaining in the United States. While in Colombia Diaz filed for a divorce from Gil, but no divorce or custody decree has yet issued from any court, in Colombia or the United States.

Since Diaz returned to Colombia, the Diaz children have lived with Gil, first in Deer Park and then in Fresh Meadows since the middle of 2003. The children are healthy and have attended schools in both places, where they earned satisfactory grades and had good attendance records. They have indicated that they wish to remain in the United States with their mother, while they also wish to continue to see their father on weekends.

**Conclusions of Law**

I. *Hague Convention Framework*

▆ The Second Circuit has clearly laid out the "framework" by which a district court must examine a Hague Convention petition when the other country in question, like Colombia, is a signatory to the Hague Convention. *See Blondin v. Dubois*, 189 F.3d 240, 245–246 (2d Cir. 1999). The court has the authority to decide only the merits of the abduction claim, not the merits of the underlying custody dispute. *See id.* "The abduction claim is limited, initially, to a determination of whether the defendant has 'wrongfully removed or retained' the child; on this issue the plaintiff bears the burden of proof." *Id.* Once the petitioner meets this burden, however, the children "must be returned unless the defendant can establish one of four defenses." *Id.* The respondent must establish either of the first two defenses by clear and convincing evidence:

either that (1) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," *id.,* or (2) that "return of the child would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms." *Id.* The other defenses, that (3) "the judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment," *id.,* or (4) that the plaintiff was "not actually exercising custody rights at the time of the removal," *id.,* need be proved by the respondent only by a preponderance of the evidence. In addition to these factors, the court also may take into consideration the preferences of an older child. *See id.* at n. 3.

The respondent makes three arguments: first, that the petitioner has not carried his burden of proving that the children were wrongfully retained in the United States; second, that the respondent has demonstrated by a preponderance of the evidence that the petition was filed more than a year after the allegedly wrongful abduction or retention, and that the children are well-settled in the United States; and third, that the two elder children are old enough to have their views taken into account, and they wish to remain in the United States.

## II.  *The Children were not "Wrongfully" Retained in the United States*

■ The Second Circuit has noted that Article 1 of the Hague Convention states that a retention or abduction is "wrongful" when such action is in violation of custody rights granted by the country "in which the child was habitually resident immediately before the removal or retention." *Croll v. Croll,* 229 F.3d 133, 137 (2d Cir. 2000). In other words, the children cannot be deemed wrongfully retained in the United States if the United States, rather than Colombia, is the country where they were habitually resident at the time of the alleged wrongful retention—in this case, December 30, 2001. *See also Gitter v. Gitter,* 2003 WL 22775375, at *3 (E.D.N.Y. Nov.20, 2003) (stating that "[t]he threshold issue is whether Israel or the United States was the 'habitual residence' of [the child] in June and July of 2002") The Second Circuit has not yet defined a standard by which this court should determine whether these children were habitually resident in Colombia or the United States at that time, but a well-reasoned and often-cited case on the subject is *Mozes v. Mozes,* 239 F.3d 1067 (9th Cir.2001). *See Armiliato v. Zaric–Armiliato,* 169 F.Supp.2d 230, 237 (S.D.N.Y.2001) (stating that "[t]he Second Circuit has not had occasion to define 'habitual residence,'" and citing *Mozes* ).

■ In *Mozes* Judge Kozinski identified the concept of "settled purpose" as one that other courts have used in determining "habitual" residence. *See Mozes,* 239 F.3d at 1074. He concluded that:

the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for temporary absence of long or short duration. Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended. If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence. On the other hand, one may

effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period. Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court.

*Id.* at 1075–76. The court has already determined above that in May of 2000 both Diaz and Gil did in fact have the settled intention of abandoning their residence in Colombia for a residence in New York. Diaz' return to Colombia with the children for a year beginning in August of 2000 did not alter that settled intent. Even if Diaz' settled purpose changed back to establishing a residence in Colombia during that period, Gil's intent never changed. As the court discussed in *Mozes,* the intention to be taken into account "is that of the person or persons entitled to fix the place of the child's residence." *Id.* st 1076.

Since the court finds that both Diaz and Gil always had joint custody of the children and, at least through December of 2001 both parents attempted to exercise joint custody, the court again looks to Mozes for guidance:

> Difficulty arises, of course, when the persons entitled to fix the child's residence no longer agree where it has been fixed—a situation that, for obvious reasons, is likely to arise in cases under the [Hague] Convention. In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for the return of a child has already agreed to the child's taking up habitual residence where it is.... On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that at least one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate togeth-

er under circumstances suggesting that they intend to make a home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.

*Id.* at 1076–77.

Judge Kozinski did caution that in order to alter a child's habitual residence there must be a "change in geography," which clearly occurred in this case, and that "home isn't built in a day," *Mozes* 239 F.3d at 1078. But "[w]hen the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long." *Id.* I find that as a matter of law, in these circumstances the more than three months the children spent in the United States in 2000, combined with the five months they spent here in 2001, are sufficient to establish that in December of 2001 the children's habitual residence was in the United States. I find that the children's stay in Colombia for about a year in between does not change this analysis, because during this interim period it was always the intent of both parents that the children eventually return to the United States. Further, the court finds that the parents had no "settled intent" that the children reside in Colombia, because during this period they often stayed with an aunt while their father was undergoing a series of surgeries, and it was never intended by the parents that the children would permanently stay with another relative. For all of these reasons, I find that Diaz has not met his burden of proving that Gil's retention of the children in the United States in December of 2001 was wrongful, and therefore his petition must be dismissed.

III. *The Children are Well–Settled in the United States*

■ Even if Diaz had met his burden of showing that the children were wrongfully retained in the United States, if Gil has shown by a preponderance of the evidence that the children are "well-settled" in the United States, they should not be returned to Colombia. In analyzing what "well-settled" means, one court in this district has written:

> Among the factors considered by the courts in determining whether a child is settled in her new environment are the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment, and whether the child has friends and relatives in the area."

*Koc v. Koc*, 181 F.Supp.2d 136, 152 (E.D.N.Y.2001). I find that Gil has shown by a preponderance of the evidence that the children are "well-settled" in the United States.[1]

I make this finding based upon the length of time the children have spent in the United States (over thirty consecutive months to this point), school records that Gil has submitted, the report authored by Ms. Hellman, and my own *in camera* interview of Valentina and Luis Eduardo. The children have lived in the New York area during the entire period they have lived in the United States, and they are in their second year at the same school in Queens. They have not been "hidden" or restricted from meeting people, and their mother has stable employment in the area as a carpenter. The children speak English well (though Valentina is in an ESL class one day per week and Juan attends ESL class four days per week) and enjoy school with a number friends there—they spend time with these friends in school and during the summer, and they speak with them on the phone. Luis Eduardo wishes to try out for the football team next year when he is old enough (American football, not soccer). While they miss their relatives in Colombia, they spend time with relatives who are in the United States, and they do not keep in contact with or miss old friends or neighbors in Colombia. For all of these reasons, I find that Gil had shown by a preponderance of the evidence that the children are well-settled in the United States.

IV. *The Children Wish to Remain in the United States*

After reading Ms. Hellman's report, meeting with the two older children *in camera*, and reading a letter sent by the youngest child, I have no doubt but that the children object to being returned to Colombia, as they wish to both stay with their mother and remain in the United States. *See Blondin v. Dubois*, 189 F.3d at 246 n. 3 (citing article 13 of the Hague Convention to for the proposition that "The court may 'refuse to order the return of a child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.' "). Valentina and Luis Eduardo are fourteen and twelve, respectively. Both children expressed a preference for living with their mother rather than their father, even though they wished to see their father on weekends, primarily because they felt their mother listened to their opinions while their father did not. This sentiment was underpinned, not surprisingly, by the

---

1. Diaz' petition was submitted more than a year after the alleged wrongful retention, almost two years, in fact.

children's negative reaction to their father's attempt to spirit them back to Colombia with no advance notice to them or to their mother. Similar feelings were also expressed by Juan Jose in his letter to the court.

The children also clearly prefer living in the United States, aside from their desire to remain with their mother. They believe that they will have better educational and professional opportunities in this country. The court makes no judgment as to whether this observation is accurate, either in general or for them in particular, but it is certainly an understandable and legitimate determination for the children to have made, based upon their life experiences. For these reasons, therefore, the court finds that the children wish to stay in the United States and that wish, consistent with the Hague Convention, should be respected.

### Conclusion

For the reasons explained above, Diaz' petition for the children to be returned to Colombia is DISMISSED as without merit, and the clerk will enter judgment to that effect.

SO ORDERED.