In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3928

PATRICE BOUVAGNET,

*Plaintiff-Appellant,*

v.

JEAN C. BOUVAGNET,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 4685—**Ronald A. Guzman**, *Judge.*

ARGUED FEBRUARY 28, 2002—DECIDED JULY 26, 2002

Before RIPPLE, MANION and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After his wife filed for divorce
in Cook County, Illinois, Patrice Bouvagnet, a resident of
France, filed a petition in the district court, seeking the re-
turn of the couple's two children to France. Mr. Bouvagnet
petitioned under the International Child Abduction Rem-
edies Act, 42 U.S.C. §§ 11601-11610 ("ICARA"), which im-
plements the Hague Convention on the Civil Aspects
of International Child Abduction, Oct. 25, 1980, T.I.A.S.
No. 11670, 1343 U.N.T.S. 89 ("Hague Convention"). The dis-
trict court dismissed the petition, holding that *Younger v.
Harris*, 401 U.S. 37 (1971), required abstention. For the rea-
sons set forth in the following opinion, we reverse the
judgment of the district court.

## I

## BACKGROUND

### A. Facts

Patrice and Jean Bouvagnet were married in New York City in 1988. They later moved to France where their twin children, Jennifer and Maxime Bouvagnet, were born in 1995. In November 1998, Patrice and Jean Bouvagnet filed for divorce in a French court and agreed to a "temporary convention," which provided that the Bouvagnets would share custody of the children. In December 1998, Mrs. Bouvagnet represented to Mr. Bouvagnet that she wanted to move to Chicago for a short time with the children where she would work as a flight attendant for her employer, United Airlines, until she could earn enough seniority and good will to secure a transfer to Paris, France. Mr. Bouvagnet agreed. That same month, Mrs. Bouvagnet initiated the application process for obtaining French citizenship.

Mrs. Bouvagnet left France with her two children that December and, after visiting her family, moved to Chicago in January 1999. Throughout 1999, Mrs. Bouvagnet continued to represent to Mr. Bouvagnet that she would soon return permanently to France. Indeed, in August 1999, Mrs. Bouvagnet visited France to sign papers concerning her application for French citizenship. In that regard, Mr. and Mrs. Bouvagnet agreed in November 1999 to put the French divorce proceedings "on hold," because Mrs. Bouvagnet's application for French citizenship was based on her marriage to Patrice Bouvagnet, a French citizen. R.1 at 13. A French court dismissed the divorce proceeding the following month for want of prosecution.

Mrs. Bouvagnet assured Mr. Bouvagnet in January 2000 that her transfer to Paris would soon be effected. In Febru-

ary 2000, however, Mrs. Bouvagnet's application for French citizenship was dismissed after she failed to appear for a mandatory meeting with French authorities. That same month, Mrs. Bouvagnet filed for divorce in Cook County, Illinois. Mr. Bouvagnet was served with the divorce petition in March 2000 while visiting his children. Mr. Bouvagnet then instituted French divorce proceedings in May 2000.[1] After the Illinois court rejected Mr. Bouvagnet's challenge to its jurisdiction, he participated in the Illinois proceedings. The Illinois court granted temporary custody of the children to Mrs. Bouvagnet in July 2000 and, in March 2001, denied Mr. Bouvagnet's request for visitation in France. Trial was set for June 2001. Mr. Bouvagnet informed the court in April 2001 that he intended to file a Hague petition, and the court struck the trial dates a few days later. The Illinois proceedings are still pending. Mr. Bouvagnet filed the petition with the federal district court in June 2001.

## B. District Court Proceedings

Upon Mrs. Bouvagnet's motion, the district court ruled that the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), required that it abstain from hearing Mr. Bouvagnet's petition. The district court took the view that it was required to abstain because three conditions existed: first, state proceedings that were judicial in nature were pending; second, the state proceedings implicated an important state interest; and third, the state proceedings afforded Mr. Bouvagnet the opportunity to present

---

[1] A French court dismissed the case because the Illinois proceedings were ongoing, but the dismissal was overturned in October 2001 and the action recently reinstated. The record does not indicate the current status of the French proceedings.

his Hague petition. *See Bouvagnet v. Bouvagnet*, No. 01 C 4685, 2001 WL 1263497, at *2-4 (N.D. Ill. Oct. 22, 2001) (citing *O'Neill v. City of Philadelphia*, 32 F.3d 785, 789 (3d Cir. 1994)). Having determined that it was required to abstain under *Younger*, the district court dismissed the case.

## II
## DISCUSSION

The movement of children from one jurisdiction to another in the course of a custodial dispute between their parents has been a major problem in the last several decades and has occupied, on both the national and international levels, significant legislative efforts to curb the prevalent abuses and to permit the matter of custody to be determined in a fair and rational manner that reduces, as far as possible, the trauma necessarily suffered by children in such a situation. Today we must determine how two of those efforts, the Hague Convention and the federal implementing legislation, ought to be reconciled with abstention principles that govern the relationship of federal and state courts in this country. In order to place this issue in an appropriate context, we pause to consider the problem that precipitated the Convention and its implementing legislation and the manner in which those enactments attempt to address it.

### A.

As of 2001, all of the states and the federal government have enacted legislation to address the problem of child abduction—a parent's taking a child from a jurisdiction that has awarded custody rights to the other parent in the hope that a court in another jurisdiction will be more sympa-

thetic to the abducting parent's plea for custody. *See* Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A; Unif. Child Custody Jurisdiction Act (UCCJA), 9 U.L.A. 261 (Supp. 2001); Unif. Child Custody Jurisdiction & Enforcement Act, 9 U.L.A. 649 (Supp. 2001). Prior to these legislative efforts, authority to determine the custody of the child readily was assumed by the jurisdiction in which the abducted child was present, and the courts of that state considered themselves free to determine custody according to what appeared to them to be, at the moment, the best interests of the child. Accordingly, as a practical matter, no jurisdictional limitations prevailed; courts of different states aggressively asserted jurisdiction over the same custody disputes and often issued conflicting orders. *See* UCCJA, Prefatory Note, 9 U.L.A. 263 (1999). Because "[i]n this confused legal situation the person who has possession of the child has an enormous tactical advantage," *id.* at 264, "the traditional wide-open jurisdictional approach inevitably led to chaos, rampant child abduction, and unending litigious strife." Christopher L. Blakesley, *Comparativist Ruminations from the Bayou on Child Custody Jurisdiction: The UCCJA, the PKPA, and the Hague Convention on Child Abduction*, 58 La. L. Rev. 449, 464 (1998). Legislation like the Uniform Child Custody Jurisdiction Act ("UCCJA"), variants of which have been enacted in almost every state, was designed to "avoid jurisdictional competition and conflict" among courts of different states and to deter abductions by limiting the exercise of jurisdiction by courts in forums to which a parent unlawfully had taken a child. UCCJA § 1, 9 U.L.A. 271 (1999); *see id.* § 8, 9 U.L.A. 526.

Despite such state legislative efforts to cooperate in matters of child custody, Congress determined that state laws controlling jurisdiction over child custody disputes were inconsistent and conflicting and that such shortcomings in the state legislation resulted in continuing child ab-

ductions. *See* Parental Kidnaping Prevention Act, Pub. L. No. 96-611, § 7(a), 94 Stat. 3569 (1980), *quoted in* 28 U.S.C.A. § 1738A, Historical and Statutory Notes (1994). It therefore enacted the Parental Kidnaping Prevention Act ("PKPA") with the goals of deterring abductions, fostering coopera- tion and avoiding jurisdictional competition and conflict among the states. *See id.* § 7(c).

The PKPA does not apply to international custody dis- putes, and, although the UCCJA does apply to international disputes, *see* UCCJA § 23, 9 U.L.A. 639 & comment, state courts have been reluctant to defer to the custody determi- nations of foreign courts or to order the return of children to foreign countries. *See* Robert J. Levy, *Memoir of an Aca- demic Lawyer: Hague Convention Theory Confronts Practice*, 29 Fam. L.Q. 171, 175 (1995). Apparently, inconsistent ap- plication of the principles underlying the UCCJA exacer- bated the problem of international child abduction just as it contributed to the problem in the domestic arena. As Congress observed in enacting the International Child Ab- ductions Remedies Act, "[i]nternational abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem." 42 U.S.C. § 11601(a)(3).

The Hague Convention, which ICARA implements, ad- dresses this problem of international child abduction. "A fundamental purpose of the Hague Convention is to pro- tect children from wrongful international removals or re- tentions by persons bent on obtaining their physical and/or legal custody." Department of State Public Notice, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,504 (Mar. 26, 1986) [here- inafter State Department Legal Analysis]. Generally, the Hague Convention requires a court to order the return of a child who has been "wrongfully removed" from the

country where the child had resided with the parent who had rightful custody of the child. Hague Convention, *supra*, arts. 3 & 12. If the Hague petition is filed more than one year since the child's wrongful removal, the court shall order the return of the child "unless it is demonstrated that the child is now settled in its new environment." *Id.* art. 12. Even the existence of a custody order in the state to which the child wrongfully has been removed will not permit the court to refuse to order the return of the child. *See id.* art. 17. Significantly, the Hague Convention and ICARA do not empower courts to make any determination concerning the merits of the custody dispute, but allow for the continuation or initiation of custody proceedings in the country to which the child is returned. *See* ICARA, 42 U.S.C. § 11601(b)(4); Hague Convention, *supra*, art. 19; State Department Legal Analysis, 51 Fed. Reg. at 10,511. Thus, both ICARA and the Hague Convention contemplate that an order for the return of a child will interfere necessarily with any custody proceeding that has begun in the state to which the child wrongfully has been removed. With this background in mind, we now turn to the situation before us.

**B.**

At the outset, it is important to stress the narrow nature of the issue before us. We are not asked in this appeal to determine whether Mrs. Bouvagnet wrongfully removed her children from France. The only issues that we must decide are whether the district court properly dismissed the petition under the *Younger* abstention doctrine and, if not, whether abstention is appropriate based on considerations of "[w]ise judicial administration," as in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).

**1.**

We review de novo a district court's decision to abstain under *Younger v. Harris*, 401 U.S. 37 (1971). *See Majors v. Engelbrecht*, 149 F.3d 709, 712 (7th Cir. 1998).

In *New Orleans Public Service, Inc. v. Council of New Orleans*, (*NOPSI*), 491 U.S. 350, 364-73 (1989), the Supreme Court of the United States undertook to describe, in contemporary terms, the *Younger* doctrine and to place principled limitations on its scope. In *NOPSI*, the Supreme Court began its appraisal by restating the general principle that must govern all exercises of federal judicial jurisdiction. "Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *NOPSI*, 491 U.S. at 358. " 'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.' " *Id.* at 358-59 (quoting *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 40 (1909)). In *NOPSI*, the Court was quick to add, however, that this principle cannot negate the traditional discretion of the federal courts to determine whether it is appropriate to grant certain types of relief in certain circumstances.

In *Younger*, the Court exercised this discretion to hold that, in the context of "Our Federalism," *Younger*, 401 U.S. at 44, federal courts ought to withhold equitable relief to avoid undue interference with the course of ongoing state proceedings. Specifically, the Supreme Court held that, absent extraordinary circumstances not at issue here, federal courts should not enjoin pending state criminal prosecutions. *Younger*, 401 U.S. at 53-54. As the Supreme Court has often explained, its holding in *Younger* rests primarily on the notion of "comity,"

that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* at 44; *see NOPSI*, 491 U.S. at 364; *Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 431 (1982). The Court has extended the reach of *Younger* to certain types of noncriminal judicial proceedings as well, *see NOPSI*, 491 U.S. at 367-68 (describing cases), but in the latest such case the Court also was careful to note that it did "not hold that *Younger* abstention is always appropriate whenever a civil proceeding is pending in a state court." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 n.12 (1987). The difficult problem is to discern in a principled manner those ongoing state proceedings in which *Younger* abstention is warranted. This issue was the focus of the Supreme Court's analysis in *NOPSI*. It also has been the focal point of considerable litigation in this circuit and in others.

Relying on the Supreme Court's decision in *Middlesex*, we often have articulated a multi-part test to determine whether a district court should abstain under *Younger*. "The Younger abstention doctrine requires federal courts to abstain from enjoining ongoing state proceedings that are (1) judicial in nature, (2) implicate important state interests, and (3) offer an adequate opportunity for review of constitutional claims, (4) so long as no extraordinary circumstances exist which would make abstention inappropriate." *Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002); *see Majors v. Engelbrecht*, 149 F.3d 709, 711 (7th Cir. 1998).

The difficulty with a test such as this one is that it often takes on a life of its own and no longer effectively imple-

ments the policy concerns that gave it birth. As the Supreme Court pointed out in *NOPSI*, the substantiality of a state's interest is an illusive inquiry. We must inquire, wrote the Court, not to the state's "interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather what we look to is the importance of the generic proceedings to the State." *NOPSI*, 491 U.S. at 365 (emphasis in original). In this respect, we have held that "*Younger* is confined to cases in which the federal plaintiff ha[s] engaged in conduct actually or arguably in violation of state law, thereby exposing himself to an enforcement proceeding in state court . . . ." *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) (quoting *Alleghany Corp. v. Haase*, 896 F.2d 1046, 1053 (7th Cir. 1990), *vacated as moot sub nom. Dillon v. Alleghany Corp.*, 499 U.S. 933 (1991)).[2] We emphasized in *Haase* and *Hinrichs* that in such cases, when the ongoing state proceedings involve criminal prosecutions or civil enforcement actions, the concerns of comity underlying the Supreme Court's decision in *Younger* are especially acute.

> Allowing [a defendant] to block the prosecution by obtaining an injunction from a federal judge would come close to allowing a state criminal defendant to remove

---

[2] The Ninth Circuit also has recognized this distinction, observing in *Green v. City of Tucson*, 255 F.3d 1086, 1093-94 (9th Cir. 2001), that the three-part test ordinarily applies only if the federal relief would interfere with the state court proceedings and that the interference requirement "ordinarily . . . restricts application of the *Younger* doctrine to circumstances in which the state court proceeding is an enforcement action against the federal court plaintiff, and is not met simply by the prospect that the federal court decision may, through claim or issue preclusion, influence the result in state court." *Id.* at 1094.

> his criminal prosecution into federal court—a course that would wreck the balance between federal and state prerogatives that is struck in the habeas corpus statute. . . .
>
> The grounds for denying a federal-court injunction are only slightly attenuated when instead of a criminal prosecution the state has brought a civil enforcement action . . . .

*Haase*, 896 F.2d at 1050. This limitation on the scope of *Younger* abstention is consistent with the types of cases in which the Supreme Court has held *Younger* to apply; in each case, the federal plaintiff sought to disrupt the ability of a state's judicial apparatus effectively to address the misconduct of a defendant.[3] Thus, *Younger* does not apply if the federal plaintiff has not engaged in misconduct that would expose him to an enforcement proceeding in state court.

As in *Haase*, "the critical element of misconduct" is missing here. *Haase*, 896 F.2d at 1053. Mrs. Bouvagnet's suit for custody of her children rests in no way on any misconduct on the part of Mr. Bouvagnet. It is true that the state

---

[3] *See Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (state's action for enforcement of nuisance statute); *Juidice v. Vail*, 430 U.S. 327 (1977) (fine for contempt); *Trainor v. Hernandez*, 431 U.S. 434 (1977) (action to recover fraudulently obtained welfare payments); *Moore v. Sims*, 442 U.S. 415 (1979) (state action for temporary custody of children believed to have been abused); *Middlesex*, 457 U.S. 423 (state proceeding to discipline attorney); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986) (administrative proceeding for sex discrimination); *Pennzoil*, 481 U.S. 1 (defendant's obligation to post bond before appealing judgment against it for tortious interference with contract; "Both *Juidice* and this case involve challenges to the processes by which the State compels compliance with the judgment of its courts.").

custody proceedings are pending and that the district court's resolution of Mr. Bouvagnet's petition may prevent those proceedings from ever reaching judgment. "But there is no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts." *NOPSI*, 491 U.S. at 373.

There is, moreover, an even more fundamental reason why the maintenance of this action does not implicate the strictures of the *Younger* doctrine. As we have noted earlier, an action under the ICARA implementing the provisions of the Hague Convention actually contemplates that a successful action might well result in the displacement of a custody decision in the state to which the child wrongfully has been taken. Indeed, one of the primary purposes of the Convention and its implementing legislation is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, *supra*, art. 1(b); *see* Elisa Perez-Vera, Explanatory Report, ¶ 16 (April 1981) [hereinafter Explanatory Report].[4] The abuse of parental child abduction arose because local jurisdictions to which a child had been taken often did not respect the pre-existing custody arrangement required by the child's habitual resi-

---

[4]   Elisa Perez-Vera was the official Hague Convention reporter for the Hague Conference on Private International Law, which drafted the Convention. *See* State Department Legal Analysis, 51 Fed. Reg. at 10,503. The State Department explains that Ms. Perez-Vera's report "is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention . . . ." *Id.*; *accord Blondin v. Dubois*, 189 F.3d 240, 246 n.5 (2d Cir. 1999). The Explanatory Report is among the Acts and Documents of the Fourteenth Session of the Conference. *See* State Department Legal Analysis, 51 Fed. Reg. at 10,503-04.

dence.[5] It was to curb this abuse that the United States assumed a treaty obligation to cooperate with other nation-states to adopt a mutual policy in favor of restoring the status quo by means of the prompt return of abducted children to the country of their habitual residence and in this way depriving custody decrees of states to which a parent has removed a child "of any practical or juridical consequences." Explanatory Report at ¶ 16. Indeed, although the state to which the child has been taken no doubt has an important interest in adjudicating the custody of a child within its borders, it now shares, with the other states of the Union, an even more important interest in ensuring that its courts are not used to escape the strictures of a custody decree already rendered by another nation-state or to otherwise interfere with the custody rights that a parent enjoys under the law of another country. We hold, therefore, in agreement with the other Circuits that have confronted the issue,[6] that a Hague petition simply does not implicate the *Younger* abstention doctrine.

**2.**

Mrs. Bouvagnet also submits that, even if *Younger* is inapplicable, abstention is appropriate under the principles set out in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). In that case, the Su-

---

[5]  *See* UCCJA, Prefatory Note, 9 U.L.A. 263-64; PKPA, Pub. L. No. 96-611, § 7(a)(3), 94 Stat. 3569 (1980).

[6]  *See Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (holding that the comity concerns of *Younger* are not implicated by a Hague petition); *Silverman v. Silverman*, 267 F.3d 788, 792 (8th Cir. 2001) (holding that district court lacked authority to abstain because the relief requested by a Hague petition is not discretionary).

preme Court held that "in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts," principles resting on "considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," sometimes permit the dismissal of a federal suit. *Id.* at 817 (alteration in original). The Court was careful to point out, however, that abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813. Moreover, the Court continued, given "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," the circumstances permitting dismissal "for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention [under the other abstention doctrines]." *Id.* at 817-18. Indeed, "[o]nly the clearest of justifications will warrant dismissal." *Id.* at 819. Construing its decision in *Colorado River*, the Court repeated these cautions in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 25-26 (1983):

> [W]e emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction.

*Id.* (emphasis in original).

For *Colorado River* to apply, the state and federal proceedings must be parallel. *See AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001). The proceedings are parallel if "substantially the same parties are litigating substantially the same issues simultaneously in two

fora." *Id.* (internal quotation omitted). "The question is not whether the suits are formally symmetrical, but whether there is a 'substantial likelihood' that the foreign litigation 'will dispose of all claims presented in the federal case.' " *Id.* (quoting *Day v. Union Mines, Inc.*, 862 F.2d 652, 656 (7th Cir. 1988)).

We do not believe that the federal ICARA case and the state custody case can be considered parallel as that term was employed in *AAR International.* Although the federal and state cases involve the same parties, we think it is unrealistic to characterize them as involving "substantially the same issues." Indeed, as we have pointed out earlier, the whole point of the federal litigation under ICARA is to determine whether the child, now the subject of a custody action in the state court to which he has been taken, ought to be returned, by virtue a federal treaty obligation, to his home nation-state. Here, the district court must determine whether Mrs. Bouvagnet wrongfully removed the children from France and, if so, whether the children nevertheless are "settled" in their new environment, in which case the court would not be obligated to grant the petition. *See* Hague Convention, *supra,* art. 12; State Department Legal Analysis, 51 Fed. Reg. at 10,509. Because Mr. Bouvagnet has not filed a Hague petition in the state court, the state court has no occasion to determine whether the children wrongfully were removed from France. Although the Illinois court would no doubt consider, as part of an overall assessment of the best interests of the child in a custody action, whether the children were settled in their new environment, that determination would be made in an entirely different context than the one that must be the focus of the district

court.[7] Notably, a custody decision by a state court does not foreclose the relief sought in a Hague petition. *See* Hague Convention, *supra*, art. 17.

Even if we were to conclude that these actions are parallel, we would not agree that abstention is warranted here. The Supreme Court has made it clear that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16. "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Id.* Our earlier decisions, following the Supreme Court's approach, confirm that there is no rigid checklist that ought to be followed to determine whether abstention is appropriate. *See Sverdrup Corp. v. Edwardsville Cmty. Unit Sch. Dist. No. 7*, 125 F.3d 546, 549-50 (7th Cir. 1997) (discussing factors). Indeed, our decisions have identified at least ten factors that may, depending on the facts and circumstances of the individual case, be relevant to the determination. *See Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 701 (7th Cir. 1992) (listing factors).

As we emphasized in *Sverdrup*, the primary duty of a district court is to exercise the jurisdiction that Congress

---

[7]  *See Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998) (discussing the meaning of "well-settled" in the context of the Hague Convention and suggesting that it was appropriate for the district court to consider factors other than a comfortable material existence, including "peculiar circumstances surrounding the children's living environment" attributable to the parental attempt to evade the original custody decree).

has conferred upon it; there is a presumption against abstention. *Sverdrup*, 125 F.3d at 549-50. The Supreme Court has also stated that "the presence of federal-law issues must always be a major consideration weighing against surrender." *Moses H. Cone*, 460 U.S. at 26. Mr. Bouvagnet's petition relies not only on a federal act, but on an international treaty that the United States has ratified. Although ICARA provides for concurrent jurisdiction with state courts, the federal court's unique interest in deciding a controversy that implicates both the United States' international treaty obligations and its concomitant interest in foreign relations weighs especially heavily against abstention. *See Lops v. Lops*, 140 F.3d 927, 943 (11th Cir. 1998) (holding *Colorado River* abstention inappropriate in Hague Convention case in part because "ICARA is a federal statute enacted to implement a treaty entered into by the federal government"); *see also Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (holding that the comity concerns of *Younger* are not implicated in a Hague Convention case because a Hague petition "implicates a paramount federal interest in foreign relations and the enforcement of United States treaty obligations").

Congress specifically, and deliberately, has vested the district courts with the jurisdiction to entertain an action under ICARA. The district court thus has the responsibility to determine, at the request of a French citizen, Mr. Bouvagnet, whether his children wrongfully have been removed from his country.

In an effort to overcome the presumption that the federal district court ought to fulfill the responsibility given by Congress, Mrs. Bouvagnet submits that the federal court's exercise of jurisdiction in this case runs counter to the most significant factor weighing in the Supreme Court's decision in *Colorado River*, "the desirability of avoiding piece-

meal litigation." *Colorado River*, 424 U.S. at 817. There, the federal statute at issue evinced a "clear federal policy . . . [of] avoidance of piecemeal adjudication of water rights in a river system." *Id.* at 819 (discussing the McCarran Amendment (also known as the McCarran Water Rights Suit Act), 43 U.S.C. § 666). Mrs. Bouvagnet submits that the district court's consideration of the Hague petition would result in piecemeal litigation because both the district court and the state court (should the petition be denied) would have to consider how "settled" their children are in their new environment. Unlike the statute at issue in *Colorado River*, however, the Hague Convention and ICARA actually contemplate the possibility of piecemeal litigation. Indeed, it is central to the Convention's function. For instance, Article 19 of the Convention provides that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, *supra*, art. 19. "It follows that once the factual status quo ante has been restored, litigation concerning custody or visitation issues could proceed." State Department Legal Analysis, 51 Fed. Reg. at 10,511. Therefore, the fact that the state court, in its custody determination, may have to consider an issue similar to one that the district court had to consider does not weigh in favor of abstention because the federal law providing the right to file the Hague petition anticipates just such a result. *See Moses H. Cone*, 460 U.S. at 19-20 (holding that the fact that a federal statute requires piecemeal litigation when necessary actually counsels against abstention).[8]

---

[8] Although a state court can entertain an action under ICARA, ICARA expresses no requirement or even preference for that forum. Indeed, the legislative history of the Act makes clear that Con-

(continued...)

In the same vein, Mrs. Bouvagnet also points out that she filed her state-court custody action before Mr. Bouvagnet filed his Hague petition. The "order in which jurisdiction was obtained by the concurrent forums" is, as a general matter, a factor to be weighed, *Colorado River*, 424 U.S. at 818, but it is not dispositive. Again, the Hague Convention and ICARA contemplate that Hague petitions will be filed after the state-court custody proceedings. Article 17 provides that "[t]he sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention . . . ." Hague Convention, *supra*, art. 17; *see* State Department Legal Analysis, 51 Fed. Reg. at 10,504 ("Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the alleged wrongdoer. This is true whether [or not] the decision as to custody was made . . . in the State to which the child has been taken."). Because the parent who wrongfully removes a child from the child's habitual residence often is motivated by the desire to seek a custody determination in a forum "he regards as more favorable to his own claims," Explanatory Report, ¶ 14, and because, in the United States, that forum will always be a state court, federal court consideration of Hague petitions would be curtailed severely if a federal

---

[8]  (...continued)
gress, after considerable discussion of the matter, determined to give the federal and the state courts concurrent jurisdiction over the matter. *See* 134 Cong. Rec. S3839-02 (1988). This determination makes good sense in light of the perceived reluctance of state courts to decline jurisdiction in favor of the jurisdiction, domestic or foreign, that previously entered an outstanding custody decree. *See* Levy, *supra*, at 175; *supra* pt. A.

court could not hear a petition once a state-court custody proceeding has begun. Therefore, because "a federal court cannot lightly abjure its responsibility to assert jurisdiction," *Lumen Constr., Inc. v. Brant Constr. Co., Inc.*, 780 F.2d 691, 694 (7th Cir. 1985), the mere fact that the state-court custody proceeding was filed first does not weigh heavily in favor of abstention.

Finally, Mrs. Bouvagnet suggests that the state court's experience with custody determinations and with the facts of this case in particular weighs in favor of abstention. We have recognized a state court's ability or inability to protect the federal plaintiff's rights as a factor to consider. *See Sverdrup Corp.*, 125 F.3d at 549 (citing *Moses H. Cone*, 460 U.S. at 23). However, whatever familiarity the state court may have with the facts of the case is significantly outweighed by the duty of federal courts to hear cases lawfully before them.

Here, the federal and international aspects of this action under ICARA are paramount and none of the countervailing considerations offered by Mrs. Bouvagnet, whether taken separately or together, can outweigh those concerns. Accordingly, abstention under the *Colorado River* doctrine would not be appropriate: the guiding principle must be that abstention is an exception to a federal court's "virtually unflagging obligation" to adjudicate a claim properly before it. *Sverdrup Corp.*, 125 F.3d at 549, 550 (internal quotation omitted).

## Conclusion

Abstention in this case under either the *Younger* or *Colorado River* doctrines is inappropriate. We therefore reverse the district court's dismissal of the Hague petition and remand the case to the district court for proceedings

consistent with this opinion. Mr. Bouvagnet may recover the cost of this appeal.

REVERSED and REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*