Felix BLONDIN, Petitioner–Appellant,

v.

Marthe DUBOIS, Respondent–Appellee.

Docket No. 98–2834.

United States Court of Appeals,
Second Circuit.

Argued May 6, 1999.

Decided Aug. 17, 1999.

Sanford Hausler, Brooklyn, N.Y. (Valerie S. Wolfman, New York, NY, of counsel), for Petitioner–Appellant.

Howard L. Jacobs, New York, NY, for Respondent–Appellee.

Before: OAKES, CABRANES, and SACK, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

This case presents issues of first impression regarding the application of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention" or "Convention"); 42 U.S.C. §§ 11601 *et seq.* (domestic implementing legislation). That treaty, which has been ratified by the United States—and thus shares with the Constitution and federal statutes the status of "supreme Law of the Land," U.S. Const., art. VI—seeks to "secure the prompt return of children wrongfully removed to or retained in" any signatory state. Hague Convention, art. 1.

As with many Hague Convention cases, this matter involves a custody dispute be-

tween now-separated parents. The mother, Marthe Dubois, concedes that she "wrongfully removed" the children—Marie-Eline and François—from France, and even forged the signature of their father, Felix Blondin, to obtain passports for the children. However, Dubois contends that she did so in order to protect the children from what she alleges was a physically abusive environment. Blondin, in contrast, denies that he abused the mother or the children.

These issues arise on an appeal by Blondin from a judgment of the United States District Court for the Southern District of New York (Denny Chin, *Judge*), denying his petition for repatriation of Marie–Eline and François. *See Blondin v. Dubois,* 19 F.Supp.2d 123 (S.D.N.Y.1998). Due to Dubois's allegations of abuse, the District Court determined, *see id.* at 127–29, that returning Marie–Eline and François to Blondin's custody would place the children at a "grave risk" of harm—thus qualifying for an exception to the Convention's presumption that abducted children should be returned to their home country. *See* Hague Convention, art. 13(b). The Court held that return of the children to France other than in Blondin's custody was impracticable, because Blondin's means were limited and he presumably could not support Dubois and the children other than in his home. *See id.* at 128. The Court also rejected Blondin's suggestion that the children could be returned to France in the custody of some third party, ruling that the children would be returned, if at all, only in their mother's custody.

On this appeal, we conclude that the Hague Convention requires a more complete analysis of the full panoply of arrangements that might allow the children to be returned to the country from which they were (concededly) wrongfully abducted, in order to allow the courts of that nation an opportunity to adjudicate custody. Courts considering Hague Convention petitions should make every effort to honor simultaneously the Convention's commitments (1) to the return of wrongfully abducted children to their home countries, for custody adjudication by courts there with proper jurisdiction, and (2) to safeguarding the children from "grave risk" of harm. The careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations— whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.

While we understand the District Court's reluctance to place the children directly into Blondin's custody, we believe the District Court should be given another opportunity to consider, under the clarified standard, whether other options are indeed available under French law—options that may allow the courts of the United States to comply *both* with the Convention's mandate to deliver abducted children to the jurisdiction of the courts of their home countries *and* with the Convention's command that children be protected from the "grave risk" of harm. Accordingly, we vacate the judgment of the District Court, and we remand the cause for further appropriate proceedings. We stress, however, that whatever the outcome of those proceedings may be, we do not disturb the District Court's conclusion that the children should not be released from the United States into the custody of their father. At most, they could return to France in the temporary care of some other person; a court in that country would then be empowered—unlike the federal courts of the United States—to make plenary determinations regarding the children's long-term custody.

### BACKGROUND

Blondin and Dubois met in the summer of 1990 and soon began living together in France, though they never wed. A daughter, Marie–Eline, was born in May 1991; a son, François, in August 1995. There is evidence in the record to suggest, however,

that family life was turbulent. Dubois testified that Blondin began beating her in 1991; in some instances, he would do so while she was holding Marie–Eline, with the result that some of Blondin's blows would fall on Marie–Eline. She also testified that on one occasion in 1992, Blondin twisted a piece of electrical cord around Marie–Eline's neck, threatening to kill both the mother and the child. After this incident, Dubois left the home for two weeks, living with Marie–Eline in a shelter for battered women before returning to Blondin. The following year, Dubois again took Marie–Eline with her to a series of shelters, living in them over a period of approximately nine months.

In April 1993, Blondin commenced an action in France to obtain custody of Marie–Eline. That proceeding was resolved in December 1993, when Blondin and Dubois reconciled, agreeing to live together with Marie–Eline at Blondin's residence. Pursuant to their agreement, the French court terminated the proceedings, and issued an order declaring that "the parental rights over the child will be exercised in common by both parents" and that "the child will have its usual residence at the fathers' [sic]." The court's order also provided for regular visitation by Dubois, in the event that she should choose to live outside Blondin's home.

Dubois testified that despite their reconciliation, Blondin continued his abuse. She testified that both during and after her pregnancy with François, Blondin repeatedly beat her and threatened her life, as well as the lives of the children. Dubois sought medical attention for her injuries on at least two occasions, and once summoned the French law enforcement authorities.

In August 1997, when Marie–Eline was six years old and François was days short of his second birthday, Dubois and the children left France for the United States without notifying Blondin, let alone obtaining his consent. Earlier in 1997, Dubois had forged Blondin's signature in order to obtain passports for the children.

Within days of discovering that Dubois and the children had left the home, Blondin sought and obtained a preliminary order from a French court, directing that the children not leave "the metropolitan territory without the previous authorization of the father." It thus appears that Blondin was not immediately aware that they had departed the country, and that they were living with Dubois and her relatives in New York City. However, Blondin had discovered their whereabouts by June 1998, when he filed the instant petition, seeking the children's return to France under the Hague Convention.

In keeping with the Convention's explicit emphasis on expeditious judicial resolution, see Hague Convention, art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children."), the District Court conducted a prompt evidentiary hearing on Blondin's petition. In that hearing, Dubois testified to the factual allegations set forth in the foregoing paragraphs; Blondin, for his part, denied that he had ever "hit" Dubois or the children, but admitted to having spanked Marie–Eline on infrequent occasions, and equivocated as to whether he may have "slapped" Dubois in the "heat of a dispute." Judge Chin also interviewed Marie–Eline, outside the presence of her parents or their attorneys. She told him that Blondin had hit her and her mother, and that this is why they had left France. She also explained that she did not want to return to France because she did not "want Daddy to hit me." In addition, she told Judge Chin that both parents beat her, but that Blondin did so more than Dubois.

By Memorandum Decision dated August 17, 1998, the District Court denied Blondin's petition. For reasons discussed in detail below, the Court determined that the children would face a "grave risk" of harm if returned to Blondin's custody. See Blondin, 19 F.Supp.2d at 127–29. The

opinion also noted that if the children were to return to France in Dubois's custody, Blondin would be financially unable to support them outside his home. *See id.* at 128. Although the opinion did not explicitly consider any alternative temporary custodial arrangement, the District Court had earlier rejected (in a ruling from the bench) the one such arrangement suggested by Blondin—namely, placement of the children in France with Marie–Eline's godmother, Noelle Gouillou, pending a final decision by the French courts. The District Court stated that "if I am going to send the children back, I am probably going to do it with Ms. Dubois."

Following entry of judgment, Blondin filed a timely notice of appeal. In light of the importance of deciding matters affecting children as expeditiously as possible, *see* Hague Convention, art. 11; Joseph Goldstein, Albert J. Solnit, Sonja Goldstein & Anna Freud, *The Best Interests of the Child* 9, 42–43 (1996),[1] it is unfortunate that neither party requested that this matter be briefed and argued on an expedited basis. At oral argument on May 6, 1999, it became clear that supplemental briefing was needed regarding the availability of remedies that might allow the children to be repatriated, while assuring their safety. In addition to directing the parties to file supplemental briefs on the subject, this Court asked the Department of State to contact the government of France and, if possible, to submit to this Court that government's position on the return of the children as well as on the availability of temporary care for them pending final adjudication of custody, in the event they should be returned.

By letter dated July 16, 1999, the government of France responded to the inqui-

ries made by the State Department. That letter, signed by Ms. B. Biondi of the French Ministry of Justice, Office of Mutual Legal Assistance in Civil and Commercial Matters—which apparently functions as France's "Central Authority" under the Convention—stated that her agency had "undertaken to ensure that measures are taken to provide the children, in the event that they are returned to France, with the necessary care pending a decision on custody rights by the French court of competent jurisdiction." In particular, she stated that the government had initiated a review of the "procedural means" by which a temporary placement might be made. She made no concrete proposal as to how this might be accomplished. Although the French Government is apparently still in the process of considering a temporary placement decision, we decide this appeal now in order to afford the District Court—the court best equipped to develop expeditiously a more complete record and to fashion appropriate relief—an opportunity to proceed with dispatch. We hope that any temporary custodial order forthcoming from France will be available by the time the District Court renders its decision on remand. In any event, we recognize the District Court's broad equitable discretion to develop the factual record, and in so doing to inform itself—through the United States Department of State—as to the views of the government of France, as well as to the efforts that have been made by that government to facilitate repatriation under the Convention.

## DISCUSSION

### I. The Framework of the Convention

The Hague Convention, to which both France and the United States are signato-

---

1. As Professor Goldstein et al. explain:

 [A] child may experience a given time period not according to its actual duration, measured objectively by calendar and clock, but according to her subjective feelings of impatience, frustration, and loss.... Procedural and substantive decision-making should not exceed the time that the child-to-

 be-placed can endure loss and uncertainty.... As a matter of normal procedure, a child's placement must be treated by legislatures, courts, and administrative agencies as a matter of urgency that comports with the child's sense of time.

 Goldstein et al., *supra,* at 42–43 (paragraphing suppressed).

ries, seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble. Under the Convention, removal or retention of a child is deemed "wrongful" when

> [(a)] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> [(b)] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.*, art. 3.

The parent (or other individual or institution) who claims that his child has been wrongfully removed may apply to the "Central Authority" of his country, or to the "Central Authority" of the country to which the children have been taken. *See id.*, art. 8. In either case, the Central Authorities of both countries will attempt to communicate with each other and with the parties, to exchange helpful information and, where possible, to achieve voluntary return. *See id.*, arts. 8–10. Alternatively—especially in those instances where voluntary resolution is not possible—the parent may file a judicial proceeding in the country to which the child has been removed. *See id.*, arts. 8, 11, 29; *see also* 42 U.S.C. §§ 11601 *et seq.* (legislation implementing the Hague Convention).

 By operation of the Convention, "a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (*"Friedrich I"*); Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *see also id.*, art. 16.[2] The abduction claim is limited, initially, to a determination of whether the defendant has "wrongfully removed or retained" the child; on this issue, the plaintiff bears the burden of proof. *See* 42 U.S.C. § 11603(e)(1)(A) (domestic legislation implementing Hague Convention, and addressing, *inter alia*, burdens of proof). However, "[o]nce a plaintiff establishes that removal was wrongful, the child *must be returned* unless the defendant can establish one of four defenses." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (*"Friedrich II"*) (emphasis added); *see* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

Two of those exceptions may be established only by "clear and convincing evidence"—either that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," pursuant to Article 13(b) of the Convention, or that return of the child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms," pursuant to Article 20. *See* 42 U.S.C. § 11603(e)(2)(A) (setting forth standard of proof for defenses pursuant to Articles 13(b) and 20). In contrast, the other two exceptions to the presumption of repatriation need only be established by a

---

2. Article 16 provides as follows:

After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

Hague Convention, art. 16.

preponderance of the evidence—either that judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment, pursuant to Article 12 of the Convention, or that the plaintiff was not actually exercising custody rights at the time of the removal, pursuant to Article 13(a) of the Convention. *See* 42 U.S.C. § 11603(e)(2)(B) (setting forth standard of proof for defenses pursuant to Articles 12 and 13(a)).[3]

■■■ As the federal statute implementing the Convention makes clear, these four exceptions are meant to be "narrow." 42 U.S.C. § 11601(a)(4).[4] They do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody. *See Friedrich I*, 983 F.2d at 1400 (noting that court deciding Hague Convention petition "has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim"); *see also Nunez–Escudero v. Tice–Menley*, 58 F.3d 374,

377 (8th Cir.1995) (considering asserted exception under Article 13(b), and stating that "[i]t is not relevant to this Convention exception who is the better parent in the long run"). Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to "preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich I*, 983 F.2d at 1400; *accord Shalit v. Coppe*, 182 F.3d 1124, 1126–27 (9th Cir.1999); *Nunez–Escudero*, 58 F.3d at 376; *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir.1995). And as the Hague Convention's Reporter has explained, "a systematic invocation of [these] exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." Elisa Perez–Vera, *Explanatory Report: Hague Conference on Private International Law*, *in* 3 Acts and Documents of the Fourteenth Session 426 (1980) (*"Perez–Vera Report "*), ¶ 34.[5]

---

3. In addition to these four exceptions, the Convention allows a court to take into account the preference of an older child. The court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. *See generally Friedrich II*, 78 F.3d at 1067 & n. 8.

4. And even where the grounds for one of these "narrow" exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent. *See Friedrich II*, 78 F.3d at 1067 ("[A] federal district court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.") (citations omitted).

5. In its "Legal Analysis" of the Hague Convention, reported at 51 Fed.Reg. 10494, 10503, the State Department explains that Perez–Vera served as "the official Hague Conference reporter for the Convention" and that "[h]er explanatory report is recognized by the

Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." *Id; accord Shalit*, 182 F.3d at 1126–28. As the Supreme Court has noted, "[b]ecause a treaty ratified by the United States is not only the law of this land . . . , but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires* ) and the postratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (Scalia, J.) (citation omitted). In a similar vein, three decades earlier Professor Myres S. McDougal and his associates explained that "[i]n some contexts, competent examination shows, the most reliable clue to the shared expectations of the parties comes from the *travaux;* in other contexts it may come from subsequent conduct." Myres S. McDougal, Harold D. Lasswell & James C. Miller, *The Interpretation of Agreements and World Public Order* 365 (1967).

## II. Application of the Convention

■ Dubois concedes that she "wrongfully abducted" the children from France, as that term is used in the Convention. Thus, she acknowledges, the children must be returned to France unless she can establish one of the exceptions provided by the Convention. *See generally Friedrich II*, 78 F.3d at 1067; 42 U.S.C. § 11601(a)(4). The single exception she asserts is that provided for in Article 13(b), which permits the court to withhold the child's return if the defendant shows by clear and convincing evidence "that there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

The District Court agreed with Dubois that returning Marie–Eline and François to Blondin would place them at "grave risk" of a "physical or psychological harm." The District Court relied principally upon the record evidence tending to show that Blondin had physically abused Dubois, often in the children's presence, and that he also had beaten Marie–Eline. *See Blondin*, 19 F.Supp.2d at 127–28. The Court also relied, to a lesser extent, upon two other factors: that Marie–Eline had expressed her desire not to return to France, *see id.* at 128–29, and that Dubois and the children "appear to have settled in well in the United States . . ., [and] returning the children to France now for custody proceedings would be extremely disruptive," *Id.* at 128. As to the latter point, the Court noted that Dubois has no financial resources of her own and was supported by relatives while in the United States. *See id.* The Court continued,

> In France, Dubois and the children would be dependent upon Blondin. Under the circumstances, I would be extremely wary of requiring Dubois and the children to live in his home. Al-

though one possibility would be to require Blondin to pay for their housing elsewhere, he represented to the Court, during discussions about scheduling a hearing, that he had "no more money" and could not afford the cost even of airfare. . . . Under these circumstances, requiring Dubois and the children to return to France for legal proceedings would present a grave risk of psychological harm or an intolerable situation.

*Id.*

■ Ample record evidence supported the District Court's factual determination regarding the risk of physical abuse that the children would face upon return to Blondin's custody. And the parties do not dispute that such a determination will normally provide the basis for an exception under Article 13(b). In contrast, the other two ancillary considerations articulated by the District Court—that Marie–Eline expressed a preference to remain in the United States and that the children "have settled in well" in this country—were not appropriately relied upon in granting the exception pursuant to Article 13(b). The Convention includes a separate provision allowing the court to take into account a child's objection to being returned "if [the court] finds that the child . . . has obtained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. The Court did not, however, determine that Marie–Eline was of such an age. Instead, the Court explicitly noted her young age and that she was "prepared, to a degree, for her appearance." *Blondin*, 19 F.Supp.2d at 128. Similarly, the circumstance of a child having become "well settled" is governed by a separate exception, which does not apply on the facts presented. Under Article 12, this exception does not apply unless the other parent waited more than one year before filing a petition for the child's return.[6] In the instant case, Blondin filed

---

6. The Hague Convention's Reporter has explained the considerations that led the drafters to select a one-year time limitation:

> The problem is an important one since, in so far as the return of the child is regarded as being in its interests, it is clear that after

his petition in June of 1998—that is, approximately 10 months after the children's August 1997 abduction. We do not rule out the possibility of a case in which a petition seeking a child's return is filed less than a year after the child's abduction, but it is nevertheless established "by clear and convincing evidence" on the child's behalf that he or she is so deeply rooted in the United States that "there is a grave risk that [the child's] return would expose the child to ... psychological harm." The child might then be excepted from return under Article 13(b). The record as now constituted does not present such a case.

In any event, it appears that the District Court placed little emphasis on these two inapplicable considerations, instead predicating the Article 13(b) exception primarily on the danger that Blondin would physically harm the children—a consideration that lies at the core of the interests this Article was designed to protect. The question remaining before us, however, is whether the District Court could have protected the children from the "grave risk" of harm that it found, while still honoring the important treaty commitment to allow custodial determinations to be made—if at all possible—by the court of the child's home country. As the Hague Convention's Reporter has explained,

> it would be advisable to underline the fact that ... the Convention does not seek to regulate the problem of the

award of custody rights. On this matter, the Convention rests implicitly upon the principle that any debate on the merits of the question, i.e. of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal....

*Perez–Vera Report, supra,* ¶ 19. The Reporter further offered the view, drawn from the proceedings underlying the Convention, that the "whole structure of the Convention" depended on the institutions of the abducted-to state generally deferring to the forum of the child's home state. *See id.* ¶ 34. As noted above, such deference is necessary to preserve "the spirit of mutual confidence which is [the Convention's] inspiration." *Id.; accord Currier v. Currier,* 845 F.Supp. 916, 923 (D.N.H. 1994).[7]

For this reason, it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation. In the exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the "supreme Law of the Land," U.S. Const., art. VI), we are required to place

---

a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it—something which is outside the scope of the Convention. Now, the difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard.

*Perez–Vera Report,* ¶ 107; *see also* Goldstein et al., *supra* at 105–06 (defending the utility of time periods in child custody statutes, despite their element of arbitrariness; citing *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting)).

7. As Professor Reisman has observed, the interpretation of a treaty given by the institutions of the United States will likely affect the other signatories' pattern of interpreting that treaty in cases involving the United States or its interests:

> All other treaty parties engage in performance-interpretation when they perform or when they react to other parties' performance-interpretations and then themselves decide whether to protest, insist on a modification, declare the treaty void, or acquiesce.

W. Michael Reisman, *Necessary and Proper: Executive Competence to Interpret Treaties,* 15 Yale. J. Int'l L. 316, 325 (1990).

our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it. *See, e.g., Friedrich II,* 78 F.3d at 1068.

As the District Court properly recognized here, *see Blondin,* 19 F.Supp.2d at 128, granting Blondin's petition would not—as a legal matter—invariably entail turning the children over to his custody. In fact, other arrangements might be available that would allow the children to return to France in some other person's care, pending a long-term custody adjudication—thus reducing or eliminating the risk of harm that might otherwise be associated with granting Blondin's petition. One possible remedy was suggested by Blondin—namely, the temporary placement (with the parties' consent) of Marie-Eline and François with their godmother, pending a final adjudication of custody by the courts of France. The District Court rejected this suggestion, stating "if I am going to send the children back, I am probably going to do it with Ms. Dubois." Having determined that the children would be returned, if at all, in their mother's care, the District Court subsequently determined in its written opinion that this arrangement would also be impracticable; the Court based this determination on its belief that the family's straitened circumstances would force Dubois and the children to live with Blondin. *See Blondin,* 19 F.Supp.2d at 128.

As stated above, we find merit in the District Court's reasons for avoiding a remedy that would effectively transfer the children directly into Blondin's custody. However, that concern appears to justify only the Court's decision that the children not be returned in their mother's care, and thereby forced to live in their father's home. It does not explain the Court's determination that the children should not be returned in the temporary custody of some appropriate and suitable third party, with adequate guarantees of child protection. The District Court did not offer any basis in the Convention or any other legal authority for its determination that a temporary third-party placement would be unacceptable, and no such basis is readily apparent to us.

Under the circumstances presented, we think it appropriate to remand this matter to the District Court for further consideration of the range of remedies that might allow *both* the return of the children to their home country *and* their protection from harm, pending a custody award in due course by a French court with proper jurisdiction.[8] In conducting that inquiry, the District Court should not limit itself to the single alternative placement initially suggested by Blondin. On remand, the Court will have the opportunity to exercise its broad equitable discretion to develop a thorough record to facilitate its decision. In so doing, the District Court should feel free to make any appropriate or necessary inquiries of the government of France—especially regarding the availability of ameliorative placement options in France—and to do so, *inter alia,* by requesting the aid of the United States Department of State, which can communicate directly with that foreign government. We trust that the District Court will conduct these proceedings on remand with the same dispatch that properly characterized its initial consideration of Blondin's Hague Convention petition. *See* Hague Convention, art. 11; Goldstein et al., *supra,* at 9, 42–43.

---

**8.** We note that Dubois's supplemental brief, and accompanying affirmation of counsel, mentioned the possibility that she could be criminally prosecuted for abducting the children, should she return to France to litigate custody. She cites no authority regarding the significance, if any, of this asserted possibility under the Convention. Dubois is free, however, to make any argument on remand that she believes follows from the asserted possibility of criminal liability on her part, and, if she does so, the District Court should obtain whatever clarification of French law may be appropriate in the circumstances, including testimony by experts and submissions by French authorities.

We emphasize, however, that we do not disturb or modify the District Court's finding that returning Marie–Eline and François to Blondin's custody (either expressly or *de facto*) would expose them to a "grave risk" of harm, within the meaning of Article 13(b). Accordingly, if the District Court remains unable to find any reasonable means of repatriation that would *not* effectively place the children in Blondin's immediate custody, it should deny Blondin's petition under the Convention.

### Conclusion

For the foregoing reasons, we vacate the judgment of the District Court and remand the cause for further proceedings consistent with this opinion, including the further consideration of remedies that would allow the children's safety to be protected pending a final adjudication of custody in France.