19-820-cv
*Saada v. Golan*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 19-820-cv

ISACCO JACKY SAADA,
*Petitioner-Appellee,*

v.

NARKIS ALIZA GOLAN,
*Respondent-Appellant.*

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: JUNE 18, 2019
DECIDED: JULY 19, 2019

Before: WINTER, CABRANES, and RAGGI, *Circuit Judges.*

Respondent-Appellant Narkis Aliza Golan ("Ms. Golan") appeals from a final order of the United States District Court for the Eastern District of New York (Ann M. Donnelly, *Judge*) granting Petitioner-Appellee Isacco Jacky Saada's petition under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") for the return of the parties' minor child, B.A.S., to Italy. On appeal, Ms. Golan challenges the District Court's conclusion that Italy is B.A.S.'s "habitual residence" for the purposes of the Hague Convention. She also contends that the District Court erred in granting the petition subject to certain conditions notwithstanding its determination that repatriating B.A.S. would expose him to "a grave risk of harm." The District Court's March 22, 2019 order is **AFFIRMED IN PART** and **VACATED IN PART**, and the cause is **REMANDED** for further proceedings.

MARISSA C.M. DORAN (Claudia Hammerman, Karen R. King, and Daniel H. Levi, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Respondent-Appellant*.

RICHARD MIN, Burger Green & Min LLP, New York, NY, *for Petitioner-Appellee*.

Rachel G. Skaistis, Amal El Bakhar, and Harry Black, Cravath, Swaine & Moore LLP, New York, NY, *for Amici Curiae* Dean Jeffrey L. Edleson, Ph.D.; Professor Steven Marans, Ph.D.; Professor Evan Stark, Ph.D.; Dr. Luz Towns-Miranda, Ph.D.; Dr. Marie G. Rudden, M.D.; the National Association of Social Workers; and the Leadership Council on Child Abuse and Interpersonal Violence.

Anita F. Stork, Covington & Burling LLP, San Francisco, CA, Shailee Diwanji Sharma, Covington & Burling LLP, New York, NY, and Ryan R. Roberts, Covington & Burling LLP, Palo Alto, CA, *for Amici Curiae* Sanctuary for Families, Inc.; Pathways to Safety International; Domestic Violence Legal Empowerment and Appeals Project; Her Justice Inc.; Day One New York Inc.; National Network to End Domestic Violence; Lawyers Committee Against Domestic Violence New York; Safe Center LI, Inc.; Legal Momentum; Professor Deborah Epstein, Co-Director, Georgetown University Law Center Domestic Violence Clinic; Battered Mothers Custody Conference; Lansner & Kubitschek;

Professor Leigh Goodmark, University of Maryland Francis King Carey School of Law; Professor Merle Weiner; New York Legal Assistance Group; Safe Horizon, Inc.; Urban Resource Institute; and Dr. Jacquelyn Campbell, National Program Director, Robert Wood Johnson Foundation Nurse Faculty Scholars.

---

JOSÉ A. CABRANES, *Circuit Judge*:

Under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"),[1] as implemented by the International Child Abduction Remedies Act,[2] "a child abducted in violation of rights of custody must be returned to the child's country of habitual residence, unless certain exceptions apply."[3] In this appeal, we address the scope of a district court's discretion to direct that a child be returned where "there is a grave risk of harm that his or her return would expose the child to physical or

---

[1] The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention").

[2] 22 U.S.C. § 9001 *et seq.*

[3] *Abbott v. Abbott*, 560 U.S. 1, 5 (2010) (internal quotation marks omitted).

psychological harm or otherwise place the child in an intolerable situation."[4]

Respondent-Appellant Narkis Aliza Golan ("Ms. Golan") appeals from a final order of the United States District Court for the Eastern District of New York (Ann M. Donnelly, *Judge*) granting Petitioner-Appellee Isacco Jacky Saada's ("Mr. Saada") petition under the Hague Convention for the return of the parties' minor child, B.A.S., to Italy. On appeal, Ms. Golan challenges the District Court's conclusion that Italy is B.A.S.'s habitual residence, and its decision to grant the petition subject to certain conditions notwithstanding its determination that repatriating B.A.S. would expose him to a grave risk of harm.

We agree with the District Court's habitual-residence determination. But we conclude that the District Court erred in granting Mr. Saada's petition because the most important protective measures it imposed are unenforceable and not otherwise accompanied by sufficient guarantees of performance. Accordingly, the District Court's March 22, 2019 order is **AFFIRMED IN PART** and **VACATED IN PART**, and the cause is **REMANDED** for further proceedings concerning the availability of alternative ameliorative measures.

---

[4] Hague Convention, art. 13(b).

5

## I.     BACKGROUND

We draw the facts, which are undisputed for the purposes of this appeal, from the District Court's thorough recitation.[5]

### A. The Parties' Relationship

On June 13, 2014, Ms. Golan, a United States citizen then living in New York, and Mr. Saada, an Italian citizen and resident, met at a wedding in Milan, Italy. Approximately two months later, Ms. Golan relocated to Milan and moved in with Mr. Saada. The parties were married on August 18, 2015, and Ms. Golan became pregnant shortly thereafter. The couple's first and only child, B.A.S., was born in Milan in June 2016.

Mr. Saada and Ms. Golan's "relationship was violent and contentious almost from the beginning."[6] The couple "fought frequently," and "Mr. Saada physically, psychologically, emotionally and verbally abused Ms. Golan."[7] Among other things, Mr. Saada yelled at Ms. Golan, called her names, slapped her, pushed her, pulled her hair, threw a glass bottle in her direction, and, during a conversation with Ms. Golan's brother, threatened to kill her. These incidents, many of which occurred in the presence of B.A.S., "were not

---

[5] *See Saada v. Golan*, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868 (E.D.N.Y. Mar. 22, 2019).

[6] *Id.* at *5.

[7] *Id.* at *4.

sporadic or isolated . . . but happened repeatedly throughout the course of the parties' relationship."[8]

Despite the significant problems in their relationship, Mr. Saada and Ms. Golan continued living together in Milan after B.A.S. was born. They secured for B.A.S. an Italian passport, medical coverage, identification cards, and a certificate of residence, and enrolled B.A.S. in a local daycare. With the exception of several trips abroad, B.A.S. lived continuously in Milan for the first two years of his life.

In July 2018, Ms. Golan traveled with B.A.S. to the United States to attend her brother's wedding. After the wedding, Ms. Golan elected not to return to Italy and moved with B.A.S. to a confidential domestic violence shelter in New York.

## B. Procedural History

In Fall 2018, Mr. Saada filed a criminal complaint against Ms. Golan and initiated civil proceedings, including custody proceedings, in Italy. He also commenced this action under the Hague Convention. In January 2019, the District Court held a nine-day bench trial at which seventeen lay and expert witnesses, including Mr. Saada and Ms. Golan, testified.

On March 22, 2019, the District Court granted Mr. Saada's petition. After a careful review of the evidence, the District Court first concluded that Italy is B.A.S.'s habitual residence for the purposes of

---

[8] *Id.* at *18 (internal quotation marks omitted).

the Hague Convention. The District Court acknowledged that Ms. Golan had repeatedly expressed an intent to return to the United States, and that Mr. Saada was aware of this intent. In the District Court's view, however, the totality of the circumstances—and, in particular, Ms. Golan's conduct—"established B.A.S. as a[n] habitual resident of Italy."[9]

Next, the District Court determined that Ms. Golan had established that repatriating B.A.S. to Italy would expose him to a grave risk of harm. Specifically, the District Court concluded that exposing B.A.S. to severe and continuing domestic violence of the type documented in this action could have significant adverse effects on his psychological health and development. This conclusion was based on both undisputed expert testimony and the facts of this case, including the District Court's findings that "Mr. Saada has to date not demonstrated a capacity to change his behavior," has "minimized or tried to excuse his violent conduct," and "could not control his anger or take responsibility for his behavior."[10]

Finally, the District Court held that a suite of conditions—or "undertakings"—would "sufficiently ameliorate the grave risk of harm to B.A.S." and granted Mr. Saada's petition subject to those conditions.[11] The undertakings include, among others, requirements that Mr. Saada (1) give Ms. Golan $30,000 before B.A.S. is returned to

---

[9] *Id.* at *16.

[10] *Id.* at *18.

[11] *Id.* at *19.

8

Italy, for housing, financial support, and legal fees; (2) stay away from Ms. Golan; and (3) visit B.A.S. only with Ms. Golan's consent.

This appeal followed.

## II.    DISCUSSION

On appeal, Ms. Golan challenges the District Court's conclusion that Italy is B.A.S.'s habitual residence, and its decision to grant Mr. Saada's petition subject to the enumerated undertakings. We affirm the District Court's habitual-residence determination but vacate its order insofar as it grants Mr. Saada's petition.

### A. Standard of Review

In cases arising under the Hague Convention, we review a district court's factual findings for clear error and its legal conclusions—including its interpretation of the Convention and its application of relevant legal standards to the facts—*de novo*.[12] Thus, as relevant here, although "[t]he habitual residence inquiry is heavily fact dependent, . . . whether the relevant facts satisfy the legal standard is a question of law that we review *de novo*."[13]

---

[12] *Ozaltin v. Ozaltin*, 708 F.3d 355, 368 (2d Cir. 2013).

[13] *Guzzo v. Cristofano*, 719 F.3d 100, 109 (2d Cir. 2013). On June 10, 2019, the Supreme Court granted *certiorari* to resolve a split among the Courts of Appeal concerning the appropriate standard of review for habitual-residence determinations. *See Taglieri v. Monasky*, 907 F.3d 404 (6th Cir. 2018) (en banc), *cert. granted*, No. 18-935, 2019 WL 266837 (U.S. June 10, 2019). Since we affirm the District Court's conclusion that Italy is B.A.S.'s habitual residence under the least

## B. Country of Habitual Residence

We take up first Ms. Golan's challenge to the District Court's conclusion that Italy is B.A.S.'s habitual residence for the purposes of the Hague Convention.

In determining habitual residence, courts in this Circuit "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared," considering both "actions" and "declarations."[14] We have observed that "[f]ocusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location."[15] But we have also cautioned that, at bottom, this inquiry "is designed simply to ascertain where a child usually or customarily lives."[16]

On review, we see no error in the District Court's conclusion that Italy is B.A.S.'s country of habitual residence. We acknowledge that certain evidence, particularly the declarations of both parties concerning Ms. Golan's intent to return to the United States, supports Ms. Golan's position. But we agree with the District Court that the parties' actions tell a different story—namely, that Italy, where B.A.S.

---

deferential standard—*de novo* review—we would necessarily affirm under the more deferential standards that other Circuits have applied.

[14] *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005).

[15] *Id.* at 132.

[16] *Guzzo*, 719 F.3d at 109.

spent almost the entirety of the first two years of his life, is the country where he "usually or customarily lives."[17] Accordingly, we affirm the District Court's habitual-residence determination.

## C. The Undertakings

Ms. Golan also challenges the District Court's decision to grant Mr. Saada's petition notwithstanding its determination that repatriating B.A.S. would expose him to a grave risk of harm.[18] In particular, Ms. Golan contends that the District Court erred in concluding that a suite of undertakings—or promises by Mr. Saada—sufficiently ameliorates the grave risk of harm to B.A.S.

We have long recognized that district courts are "vested with considerable discretion under the [Hague] Convention."[19] Thus, even where the abducting parent establishes that repatriating his or her child would expose the child to a grave risk of harm, a district court "is not necessarily bound to allow the child to remain with the abducting parent."[20] In exercising their discretion in such cases,

---

[17] *See id.*

[18] Mr. Saada does not contest the District Court's grave-risk determination, and we do not revisit it here.

[19] *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013).

[20] *Blondin v. Dubois*, 189 F.3d 240, 246 n.4 (2d Cir. 1999); *see also* Hague Convention, art. 13 (permitting, but not requiring, contracting states to decline "to order the return of the child" if certain exceptions are established); U.S. Dep't of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986) ("[A] finding that one or more of the

district courts must "take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation."[21] Insofar as certain of these measures might be undertaken by courts in the country of habitual residence, then "the exercise of comity that is at the heart of the [Hague] Convention" requires us "to place our trust in th[ose] court[s] . . . to issue whatever orders may be necessary to safeguard children who come before [them]."[22]

At the same time, the jurisdiction of our district courts is not limitless. As the Eleventh Circuit has aptly observed, "reviewing courts are free to enter conditional return orders" but "retain no power to enforce those orders across national borders."[23] And in those instances in which our courts lack jurisdiction to redress non-compliance, "even the most carefully crafted conditions of return may

---

exceptions provided by Articles 13 and 20 are applicable does not make refusal of a return order mandatory. The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

[21] *Blondin*, 189 F.3d at 248.

[22] *Id.* at 248–49.

[23] *Baran v. Beaty*, 526 F.3d 1340, 1350 (11th Cir. 2008); *cf. Ermini v. Vittori*, 758 F.3d 153, 168 (2d Cir. 2014) ("Once a determination properly applying the Convention to the facts at hand has been made, all other issues leave the realm of the treaty's domain. The Convention is not, and cannot be, a treaty to enforce future foreign custody orders, nor to predict future harms or their dissipation.").

prove ineffective in protecting a child from risk of harm."[24] We conclude that, in cases in which a district court has determined that repatriating a child will expose him or her to a grave risk of harm, unenforceable undertakings are generally disfavored,[25] particularly where there is reason to question whether the petitioning parent will comply with the undertakings and there are no other "sufficient guarantees of performance."[26]

In this case, it is undisputed that many of the undertakings the District Court imposed are unenforceable because they need not—or cannot—be executed until after B.A.S. is returned to Italy. This includes several conditions that, under the circumstances, are essential to mitigating the grave risk of harm B.A.S. faces—namely, promises by Mr. Saada to stay away from Ms. Golan after she and B.A.S. return to Italy and to visit B.A.S. only with Ms. Golan's consent.[27] The District Court's factual findings provide ample reason to doubt that Mr. Saada

---

[24] *Baran*, 526 F.3d at 1350; *see also Danaipour v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002) ("The court entertaining the petition must recognize the limits on its authority and must focus on the particular situation of the child in question in order to determine if the undertakings will suffice to protect the child.").

[25] *See Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) ("Where a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all.").

[26] *See Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000) ("A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and *sufficient guarantees of performance of those undertakings*." (emphasis added)).

[27] *See* note 11 and accompanying text, *ante*.

will comply with these conditions.[28] And the record does not otherwise contain evidence of sufficient guarantees of performance. Under the circumstances, we are not convinced that these particular undertakings are sufficient to mitigate the undisputed grave risk of harm that B.A.S. faces if returned to Italy. Accordingly, we vacate the District Court's order insofar as it granted Mr. Saada's petition subject to the conditions enumerated therein.

### D. Availability of Alternative Ameliorative Measures

Having determined that the undertakings the District Court imposed are insufficient under the circumstances presented here, we must determine whether to direct the District Court to deny Mr. Saada's petition or to remand for further proceedings concerning the availability of alternative measures. In our view, the latter course is more appropriate.

As we have previously observed, in cases of this nature, it is important for courts to consider "the [full] range of remedies that might allow *both* the return of the children to their home country *and* their protection from harm."[29] District courts have "broad equitable discretion to develop a thorough record" on potential ameliorative

---

[28] *See* note 10 and accompanying text, *ante*; *see also Saada*, 2019 WL 1317868, at *18 (recounting testimony of Mr. Saada's expert that Mr. Saada's "reliability was 'down the tube'").

[29] *Blondin*, 189 F.3d at 249 (emphasis in original).

measures.[30] And, in our view, it is by no means inevitable that there will be *no* conditions conducive to balancing our commitment to ensuring that children are not exposed to a grave risk of harm with our general obligation under the Hague Convention to allow courts in the country of habitual residence to address the merits of custody disputes.[31]

On review, we cannot conclude that the record before the District Court would have permitted a finding that this is such a case. Accordingly, we think it appropriate to remand the cause to the District Court for further proceedings. On remand, the District Court must determine whether there exist alternative ameliorative measures that are either enforceable by the District Court or, if not directly enforceable, are supported by other sufficient guarantees of performance.

In doing so, the District Court may consider, among other things, whether Italian courts will enforce key conditions such as Mr. Saada's promises to stay away from Ms. Golan and to visit B.A.S. only with Ms. Golan's consent. There is some dispute concerning whether it is appropriate for courts in the United States to condition orders of

---

[30] *Id.*

[31] *See Blondin v. Dubois*, 238 F.3d 153, 163 (2d Cir. 2001) (affirming district court's decision declining to order return and emphasizing that "*uncontested* expert testimony" established that "the children will face a recurrence of traumatic stress disorder if repatriated" (emphasis added)); *see also id.* at 162 (noting that "the authorities in [the country of habitual residence]—for reasons entirely beyond their control—cannot provide the children with the necessary protection").

return on a foreign court's entry of an order containing similar protective measures.[32] But we do not think that international comity precludes district courts from ordering, where practicable, that one or both of the parties apply to courts in the country of habitual residence for any available relief that might ameliorate the grave risk of harm to the child.[33] So long as the purpose of such an order is to ascertain the types of protections actually available, and the district court does not condition a child's return on any particular action by the foreign court, there is little risk that this "practice would smack of coercion of the foreign court."[34]

---

[32] *Compare Danaipour*, 286 F.3d at 23 ("Conditioning a return order on a foreign court's entry of an order . . . raises serious comity concerns."), *with Baran*, 526 F.3d at 1349 ("Undertakings may take many forms, including direct orders by the reviewing court providing conditional return of the child and mirror-orders (also called safe harbor orders) requiring the petitioning parent to obtain a conditional custody order in the country of habitual residence before return of the child is ordered.").

[33] In most cases, the international comity norms underlying the Hague Convention require courts in the United States to assume that an order by a foreign court imposing protective measures will guarantee performance of those measures. *See* note 22 and accompanying text, *ante*. But, in certain circumstances, even a foreign court order might not suffice. *See Simcox*, 511 F.3d at 608 ("[U]ndertakings would be particularly inappropriate . . . in cases where the petitioner has a history of ignoring court orders."); *Walsh*, 221 F.3d at 221 (rejecting use of undertakings where petitioning parent "violated the orders of the courts of Massachusetts" and "the courts of Ireland," and there was "every reason to believe that he [would] violate the undertakings he made to the district court in this case and any barring orders from the Irish courts").

[34] *Danaipour*, 286 F.3d at 23.

Here, the District Court has already found—and the parties do not dispute—that Italian courts are authorized by Italian law to enter "criminal and civil court orders of protection" and "orders of supervised visitation during the pendency of custody proceedings."[35] Although the Italian courts have not entered any such orders to date in the matter before us, this might be attributable in part to the parties' failure to apply for relief, in the ongoing custody proceedings or otherwise. On remand, the District Court may consider whether it is practicable at this stage of the proceedings to require one or both of the parties to do so.[36] The District Court may then take into account any corresponding decision by the Italian courts in determining whether there are sufficient guarantees of performance of protective measures that will mitigate the grave risk of harm B.A.S. faces if repatriated.

This is, of course, just one of several avenues the District Court may elect to pursue. As an initial matter, the District Court can attempt to revise certain of the undertakings it imposed in a manner that would render them directly enforceable—for example, by requiring Mr. Saada to comply with the condition before B.A.S. is repatriated.[37]

---

[35] *See Saada*, 2019 WL 1317868, at *13.

[36] And, it almost goes without saying, the parties can petition the Italian courts to impose protective measures even without prompting by the District Court.

[37] We note, for instance, that the condition pertaining to monetary support requires Mr. Saada to act before B.A.S. returns to Italy. *See* note 11 and accompanying text, *ante*.

In addition, as we have previously recognized, the District Court can use its "broad equitable discretion" to "request[ ] the aid of the United States Department of State, which can communicate directly with" the government of Italy to ascertain whether it is willing and able to enforce certain protective measures.[38] Finally, the District Court can solicit from the parties additional evidence concerning whether—and, if so, to what extent—Mr. Saada has undertaken to abide by any of the currently unenforceable conditions. We leave these matters to the informed discretion of the District Court and "trust that [it] will conduct the[ ] proceedings on remand with the same dispatch that properly characterized its initial consideration" of the petition.[39]

## III. CONCLUSION

To summarize, we hold that:

(1) The District Court did not err in concluding that Italy is B.A.S.'s "habitual residence" for the purposes of the Hague Convention.

(2) In cases in which a court has determined that repatriating a child will expose him or her to "a grave risk of harm," unenforceable undertakings are generally disfavored, particularly where there is reason to question whether the petitioning parent will comply with the undertakings and there are no other sufficient guarantees of performance.

---

[38] *Blondin*, 189 F.3d at 249.

[39] *Id.*

Here, the District Court erred in granting the petition subject to (largely) unenforceable undertakings despite adverse factual findings concerning Mr. Saada's credibility and the absence of other sufficient guarantees of performance.

(3) Because the record before the District Court does not support the conclusion that there exist no protective measures sufficient to ameliorate the grave risk of harm B.A.S. faces if repatriated, remand for further proceedings is appropriate.

(4) On remand, the District Court should consider whether there exist alternative ameliorative measures that are either enforceable by the District Court or supported by other sufficient guarantees of performance.

(5) Where, as here, the safety of a minor is at risk, the District Court, if it deems practicable, may direct one or both of the parties to petition Italian courts for the imposition of any appropriate protective measures. The District Court may take into account any corresponding decision by the Italian courts in determining whether to issue an order of return.

For the foregoing reasons, the District Court's March 22, 2019 order is **AFFIRMED IN PART** and **VACATED IN PART**, and the cause is **REMANDED** for further proceedings. In the interest of judicial economy, any future appeals in this action will be referred to this panel.