20-1544
*Saada v. Golan*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of October, two thousand twenty.

PRESENT:  JOHN M. WALKER, JR.,
                    STEVEN J. MENASHI,
                            *Circuit Judges.*\*

_____

Isacco Jacky Saada,

              *Petitioner-Appellee,*

        v.                                                          No. 20-1544

Narkis Aliza Golan,

              *Respondent-Appellant.*

_____

---

\* Senior Circuit Judge Ralph K. Winter, originally a member of the panel, is currently unavailable, and the appeal is being adjudicated by the two available members of the panel, who are in agreement. *See* 2d Cir. IOP E(b).

*For Petitioner-Appellee*: RICHARD MIN, Burger Green & Min, LLP, New York, NY

*For Respondent-Appellant*: DANIEL H. LEVI (Karen King, Phoebe H. King, Steven Kessler, on the brief), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY

Appeal from a judgment of the United States District Court for the Eastern District of New York (Donnelly, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgment of the district court is **AFFIRMED**.

Respondent-Appellant Narkis Aliza Golan appeals the district court's order granting the petition of Petitioner-Appellee Isacco Jacky Saada for the return of their son, B.A.S., to Italy pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. The district court granted Saada's petition after determining that there were adequate ameliorative measures that remedied any grave risk of harm to B.A.S. upon his return to Italy. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal.

This marks the second time this case comes before our court. In Golan's earlier appeal, we ruled that the district court's initial order failed to adequately remedy the grave risk of harm to B.A.S. that the court found would result from B.A.S.'s return to Italy. *Saada v. Golan*, 930 F.3d 533, 540 (2d Cir. 2019) (*Saada II*). We remanded the case to allow the district court to determine if other ameliorative measures were available to remedy that risk of harm and could be "either enforceable by the District Court or ... supported by other sufficient guarantees of performance." *Id.* at 541. On remand, the district court sought out such measures, found the measures to be satisfactory, and granted Saada's petition. Finding no clear error in the district court's factual determinations, and concluding that those facts support its judgment, we affirm.

**Background**

Isacco Saada and Narkis Golan wed in Milan in August 2015. They had a son, B.A.S., the next June and lived in Milan for the first two years of his life. In July 2018, Golan traveled with B.A.S. to the United States for a wedding, and they have remained in the United States since that time. The district court determined that Italy was B.A.S.'s country of habitual residence for the purposes of the Hague Convention. *Saada v. Golan*, No. 18-CV-5292, 2019 WL 1317868, at *17 (E.D.N.Y.

3

Mar. 22, 2019), *aff'd in part, vacated in part, remanded*, 930 F.3d 533 (2d Cir. 2019) (*Saada I*). We affirmed that decision in Golan's initial appeal. *Saada II*, 930 F.3d at 539.

Saada's relationship with Golan was abusive almost from its inception. The district court found that Saada would yell, slap, hit, and push Golan. He would call her names and pull her hair. He once threw a glass bottle at her and also threatened to kill her. This abuse often occurred in B.A.S.'s presence. Saada admitted to many relevant accusations. *Saada I*, 2019 WL 1317868, at *5.

The district found, based on expert testimony, that Saada's abuse of Golan had and could continue to have severe effects on B.A.S.'s psychological health. *Id*. at *18. The district court noted that Saada, at that point, had not demonstrated an ability to change his behavior or to control his anger. *Id.* As a result, the district court concluded that returning B.A.S. to Italy would subject him to a grave risk of psychological harm, and therefore the Hague Convention did not require that the district court order B.A.S.'s return. *Id.*

That conclusion, however, did not end the analysis. Circuit precedent required the district court to determine if there were any ameliorative measures, or "undertakings," it could impose on Saada that would eliminate the grave risk

of harm to B.A.S. and allow the court to return B.A.S. back to Italy. *Id.* (citing *Blondin v. Dubois*, 189 F.3d 240, 248 (2d Cir. 1999) (*Blondin I*)). The court decided that it could mitigate the grave risk by ordering Saada, *inter alia*, to pay Golan $30,000, to stay away from her in Italy, and to visit B.A.S. only with Golan's consent. *Id.* at *19 & n.40.

On appeal, we vacated the district court's decision regarding the adequacy of these ameliorative measures. *Saada II*, 930 F.3d at 540. We ruled that to eliminate a grave risk of harm, the ameliorative measures must be either enforceable by the district court or supported by other sufficient guarantees of performance. *Id.* at 541. Because the district court could not enforce its instructions regarding Saada's distance from Golan and visits with B.A.S. once the parties were in Italy—and there were no other guarantees of performance—the district court's order did not adequately ameliorate the grave risk of harm to B.A.S. *Id.* at 540.

We remanded the case for the district court to determine if any other enforceable or sufficiently guaranteed ameliorative measures were available. *Id.* at 541. Specifically, we invited the district court to consider whether Italian courts could issue orders that prohibited Saada from approaching Golan or visiting B.A.S. without her consent. *Id.* at 541-42.

On remand, the district court communicated with Italian authorities to determine whether they could issue a protective order requiring Saada to stay away from Golan and to attend therapy. J. App'x 493-511. The district court then instructed the parties to petition the Italian courts for such an order. *Id.* at 512-14. The parties complied. *Id.* at 517-40.

An Italian court entered an order requiring, *inter alia*, that (1) Saada not approach Golan, her place of work or residence, or B.A.S.'s school; (2) B.A.S. be entrusted to Italian social services and placed with Golan for residence; (3) Saada visit B.A.S. only in a neutral space under observation by Italian social services; and (4) Italian social services evaluate Saada and initiate psychological counseling for him. *Id.* at 564-66. This protective order will run for one year from when Golan and B.A.S. arrive in Italy and is renewable. *Id.* at 564.

In light of these developments, the district court granted Saada's petition to return B.A.S. to Italy. *Saada v. Golan*, No. 118-CV-5292, 2020 WL 2128867, at *6 (E.D.N.Y. May 5, 2020) (*Saada III*). The district court noted that Saada had complied with previous social service investigations in Italy and that he had he abided by all conditions of his supervised visits with B.A.S. in the United States. *Id.* at *4. Combined with the consequences Saada would face for violating the Italian

6

protective order, the district court concluded that these findings provided it with sufficient confidence that Saada would comply with that order. *Id.* Additionally, the district court indicated that the psychological counseling mandated by the Italian court could reduce Saada's abusive tendencies. *See id.* The district court also ordered Saada to pay Golan $150,000 to cover her and B.A.S.'s expenses upon their return to Italy. *Id.* at *5. Taken together, the district court concluded, these measures ameliorated the "grave risk of harm to B.A.S." that could result from "exposure to violence between" Saada and Golan. *Id.* at *2. In making its decision, the court also noted the absence of "evidence in the record that [Saada] was abusive to B.A.S. or that B.A.S. would be unsafe with [Saada]." *Id.* at *2 n.4.

Golan now appeals the district court's decision to grant Saada's petition.

**Standard of Review**

"We review the district court's interpretation of the [Hague] Convention *de novo* and its factual determinations for clear error." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013). Clear error review is "significantly deferential," and "[w]e must accept the trial court's findings unless we have a definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). "The District Court's *application* of the Convention to the facts it has found, like the

7

*interpretation* of the Convention, is subject to de novo review.*" Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (*Blondin II*). In this case, then, we will employ a clear error standard to assess the district court's findings that Saada will comply with the Italian court order and that the $150,000 payment to Golan will meet her and B.A.S.'s needs until a custody arrangement is concluded. We then determine *de novo* if, given those conclusions, the protective measures adequately ameliorate the "grave risk of harm" to B.A.S. *See id.*

**Discussion**

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, requires courts to "promptly return[]" a child removed from his country of habitual residence "unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). Article 13(b) of the Convention provides an exception for cases in which "there is a grave risk" that repatriation "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The ICARA places the

8

burden on the respondent to prove, by clear and convincing evidence, that this exception applies. 22 U.S.C. § 9003(e)(2)(A).

A district court that finds a grave risk of harm "must examine the full range of options that might make possible the safe return of a child" before denying repatriation. *Blondin II*, 238 F.3d at 163 n.11. This rule "honor[s] the important treaty commitment to allow custodial determinations to be made—if at all possible—by the court of the child's home country." *Blondin I*, 189 F.3d at 248. However, a district court may rely only on "ameliorative measures that are either enforceable by [it] or … supported by other sufficient guarantees of performance." *Saada II*, 930 F.3d at 541.

In this case, the district court found that "exposure to violence" perpetuated by Saada against Golan posed a "grave risk of harm to B.A.S." *Saada III*, 2020 WL 2128867, at *2.[1]  After taking steps to ensure that a protective order from the Italian courts would be in place upon the return of B.A.S. to Italy, however, the district

---

[1] On appeal, Golan argues that the district court failed to account for *other* grave risks of harm. These include risks that B.A.S. will be retraumatized simply by returning to Italy and that Saada will directly abuse B.A.S. in Italy. Appellant's Br. 41-45. Because Golan did not establish additional risks by clear and convincing evidence, the district court did not err in focusing on the risk of exposure to violence.

court subsequently found that this Italian protective order coupled with a $150,000 payment from Saada to Golan ameliorated that risk. *Id.* at \*2-6. These measures, if effective, will ensure that Saada and Golan are not in the same place.[2] This separation, in turn, protects B.A.S. from any trauma that would result from abuse that Saada might perpetrate against Golan if they were together, and therefore ameliorates the grave risk of harm to B.A.S.

These measures are "either enforceable by the District Court or … supported by other sufficient guarantees of performance." *Saada II*, 930 F.3d at 541. The district court can enforce its order that Saada must make the $150,000 payment before B.A.S. is repatriated. And the existing Italian protective order and ongoing involvement of the Italian courts with this case provides sufficient assurance that Saada will not approach Golan in Italy. *See id.* at 541 n.33 ("In most cases, the international comity norms underlying the Hague Convention require courts in

---

[2] The $150,000 payment—which amounts to over 75 percent of what Golan claimed her and B.A.S.'s expenses will be in Italy until an Italian court can enter a support order—ensures that B.A.S. will be able to live with Golan during the pendency of the custody proceedings in Italy and that Golan will not need to rely on Saada for support during that time. Without this payment, there might be a risk that Golan would need to interact with Saada regarding B.A.S.'s expenses, and that interaction could have created the risk of abuse in B.A.S.'s presence.

the United States to assume that an order by a foreign court imposing protective measures will guarantee performance of those measures.").

Golan argues that this case presents a circumstance in which "even a foreign court order might not suffice," *id.*, because Saada will not comply with the Italian protective order. Golan points to the district court's findings in the initial proceeding that Saada "has to date not demonstrated a capacity to change his behavior" and "could not control his anger." *Saada I*, 2019 WL 1317868, at *18. The district court also commented then that Saada's "reliability was 'down the tube.'" *Id.*

On remand, however, the district court concluded that Saada will likely comply with the Italian protective order. The court observed that Saada has complied with previous Italian social service investigations as well as the conditions of his supervised visits with B.A.S. in the United States. *Saada III*, 2020 WL 2128867, at *4. The court also noted that Saada knows he will face consequences in Italy, in terms of both contempt of court and B.A.S.'s custody and visitation determination, if he violates the Italian court's protective order. *Id.*

Given the record before us, we do not have a "definite and firm conviction that a mistake has been committed" by the district court. *Souratgar*, 720 F.3d at 103.

11

Saada has shown an ability to follow rules in related contexts and knows the Italian court will police his activities and punish him for violations. The district court, therefore, did not clearly err in determining that Saada will likely comply with the Italian protective order.

In light of this finding, the district court correctly concluded that there existed sufficiently guaranteed ameliorative measures that would remedy the grave risk of harm to B.A.S. upon his return to Italy. It therefore properly granted Saada's petition.[3]

---

[3] Our court recently rejected an appeal that presented facts very similar to this case. In *Valles Rubio v. Veintimilla Castro*, we concluded that a district court did not err in determining that "ameliorative measures such as litigation in Ecuadorian courts were sufficient to protect" the child from the grave risk of harm presented by his father's "physical and psychological abuse." 813 F. App'x 619, 621 (2d Cir. 2020). In so holding, we highlighted the mother's "record of … successful litigation in Ecuadorian courts" and measures set out in an agreement between the parents that provided for "weekly visits between [the child] and [his mother's] family [and] daily conversations by video or telephone between" the mother and child. *Id.* "Although we decided [*Valles Rubio*] by nonprecedential summary order, rather than by opinion, our '[d]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases.'" *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (quoting Order dated June 26, 2007, adopting 2d Cir. Local R. 32.1). Unlike the respondent in *Valles Rubio*, Golan is not a citizen of the country of her child's habitual residence nor does she speak the local language well. *Saada III*, 2020 WL 2128867, at *5. In other respects, however, this case includes greater assurances of amelioration. Unlike the petitioner in *Valles Rubio*, Saada does not have a history of directly abusing B.A.S., *id.* at *2 n.4, and unlike the mother there, Golan will be returning to Italy with B.A.S., *id.* at *2. Furthermore, the parties here already have a foreign protective order in place while the parties in *Valles Rubio* did not.

We have considered Golan's remaining arguments, which are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court